UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN MARINELLI,
    Petitioner

       v.

JEFFREY BEARD, Commissioner,
Pennsylvania Department of Corrections;
LOUIS B. FOLINO, Superintendent of
the State Correctional Institution at
Greene; and FRANKLIN J. TENNIS,
Superintendent of the State Correctional
Institution at Rockview,

    Respondents:

: CIVIL ACTION NO. 4:CV-07-0173
:
:
:       (Judge Mariani)
:
:
:
:
:   **THIS IS A CAPITAL CASE**
:
:
:
:
:

FILED
SCRANTON

NOV 26 2012

PER _____
            DEPUTY CLERK

## **MEMORANDUM**

## I.   **INTRODUCTION**

Before the Court is a counseled petition for writ of habeas corpus, filed

pursuant to 28 U.S.C. § 2254, on behalf of Petitioner, Kevin Marinelli

("Marinelli"), an inmate currently incarcerated in the Greene State Correctional

Institution, Waynesburg, Pennsylvania. Marinelli challenges his 1997 conviction

and sentence in the Court of Common Pleas of Northumberland County,

Pennsylvania. For the reasons set forth below, and after careful consideration of

his petition, this Court concludes that Petitioner's claims are, either procedurally defaulted or, without merit.

## II.   **FACTUAL AND PROCEDURAL HISTORY**

On May 18, 1995, Marinelli was found guilty of first degree murder, robbery, conspiracy to commit robbery, burglary, theft by unlawful taking, receiving stolen property and aggravated assault, following a jury trial in the Court of Common Pleas of Northumberland County, Pennsylvania. The Pennsylvania Supreme Court summarized the relevant facts as follows:

> The testimony at appellant's trial established the following facts. On the evening of April 26, 1994, appellant and his brother, Mark Marinelli (Mark), and Kirchoff met at appellant's apartment to plan a burglary of the residence of Conrad Dumchock (Dumchock), whom Mark knew to have stereo equipment. The three men obtained weapons, disguises, and gloves in preparation for the burglary, and proceeded to Dumchock's home in Kulpmont.

> Dumchock was home alone and had just spoken to his sister and brother-in-law on the telephone for forty-five minutes. The Marinelli brothers and Kirchoff arrived at Dumchock's home and initially had difficulty gaining entry. Observing that Dumchock's car was parked outside his house and concerned about the possibility of being discovered, the threesome left Dumchock's residence but returned a few minutes later to again attempt to enter. Eventually, they broke a small window in the kitchen door and entered the residence.

> Upon entering Dumchock's residence, appellant immediately proceeded to the second floor, where he encountered Dumchock. When Dumchock requested that appellant leave his home, appellant

2

struck Dumchock's face with his gun and yelled for assistance from Mark and Kirchoff.

The appellant and Kirchoff continued to beat Dumchock, despite Dumchock's pleading with them to take what they wanted and leave him alone. The three rummaged through Dumchock's home looking for items to take and asking Dumchock where his guns and money were located. When Dumchock would moan or not answer, appellant would hit Dumchock again.

Mark and Kirchoff departed Dumchock's home after they had loaded the items they wished to steal, while appellant remained in the residence with Dumchock. Appellant then shot Dumchock twice in the head, with one shot into Dumchock's eye and the other directly between Dumchock's eyes. Appellant then ran out of Dumchock's house and exclaimed, "Let's get out of here!"

The threesome returned to Kirchoff's home and divided the items stolen from Dumchock. A short while later, the Marinelli brothers returned to Dumchock's house and took a motorcycle from the victim's porch.

Appellant attempted to start the motorcycle on compression, with Mark following in a car. They were observed crossing the main road in Kulpmont heading toward the other side of town. When the motorcycle would not start, appellant abandoned it.

On the morning following the killing, Clyde Metzger, who was waiting for Dumchock to drive him to work, entered the victim's home and discovered Dumchock's stereo equipment had been disarranged and Dumchock's dog was shaking. Metzger called out to Dumchock but received no response. Metzger became concerned and left Dumchock's home, and headed to the police station. On his way there, Metzger encountered a Kulpmont Police Sergeant Detective Robert Muldowney, and related to him the circumstances he had found.

Sergeant Muldowney entered Dumchock's home, noting that the storm door was open, the inside door was propped open with a chair, and the glass had been broken from a window in the door. Inside the house, Sergeant Muldowney discovered that telephone cords had been cut. Upstairs, Sergeant Muldowney discovered the victim's cold body lying at the top of the stairway landing. Sergeant Muldowney noted that Dumchock's bedroom was disheveled, with drawers removed from the dresser and various items strewn on the victim's bed. Pennsylvania State Police and County Coroner Richard Ulrich were called to the scene. The victim's sister also arrived at his house and noted that Dumchock's motorcycle was missing. The motorcycle was later recovered hidden in some brush where it had been abandoned. Dumchock's brother-in-law informed police that guns, tools, and electronic equipment were also missing from Dumchock's residence. One of Dumchock's friends, David Dormer, was brought to Dumchock's residence to assist police in determining which stereo equipment, as well as liquor, was missing.

On May 25, 1994, Mark Marinelli's girlfriend, Deeann Chamberlain, turned over to Coal Township Police certain weapons which Mark had brought to her home. These weapons were later identified as having belonged to the victim. County Coroner Ulrich was at the Coal Township police station when Ms. Chamberlain turned over these weapons. The coroner connected the items with the Dumchock killing, and notified the District Attorney and State Police. Further, Ms. Chamberlain allowed Shamokin Police to come to her home and remove other items Mark had left there, including a telephone answering machine. Coroner Ulrich recognized the telephone answering machine as being of the type reported missing from Dumchock's house, and he notified the State Police.

Additionally, a friend of appellant, Nathan Reigle, was questioned by police about the Dumchock murder. Reigle stated to police that appellant had bragged about how he had killed Dumchock. A search of appellant's residence by police recovered a number of items, including stereo equipment, later identified as property belonging to the victim. After being questioned by police, appellant gave police

4

> both an oral and a taped confession as to his involvement in the
> Dumchock killing.

See Commonwealth v. Marinelli, 547 Pa. 294, 306-308 690A.2d 203, 209-210 (1997) ("Marinelli-1"). The penalty phase commenced the following day, May 19, 1995. During the penalty phase, the jury found two aggravating circumstances: (1) Marinelli committed the killing while in the perpetration of a felony, see 42 Pa. Cons. Stat. Ann. § 9711(d)(6); and (2) Marinelli committed the offense by means of torture, see 42 Pa. Cons. Stat. Ann. § 9711(d)(8). The jury also found two mitigating circumstances: (1) Marinelli had no significant history of prior convictions, see 42 Pa. Cons. Stat. Ann. § 9711(e)(1); and (2) other evidence in mitigation concerning the character and record of Marinelli, see 42 Pa. Cons. Stat. Ann. § 9711(e)(8). The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and returned a verdict of death, see 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv).

On August 11, 1995, the trial court formally imposed a sentence of death for first degree murder. Additionally, Marinelli was sentenced to consecutive terms of imprisonment of ten (10) to twenty (20) years on the robbery conviction; five (5) to ten (10) years on the conspiracy to commit robbery conviction; and ten (10) to twenty (20) years on the burglary conviction. No post sentence motions were filed.

Represented by Attorney James. J. Rosini, Petitioner filed a timely direct appeal to the Pennsylvania Supreme Court[1], raising four (4) claims for relief. Specifically, Petitioner presented the following issues for review:

I.    Is the verdict contrary to the evidence?

II.    Is the verdict contrary to the weight of the evidence?

III.    Is the verdict as to the sentence of death invalid due to the Commonwealth's failure to prove torture?

IV.    Did the trial court commit error when it:

1. Improperly granted Commonwealth's motion to consolidate?

2. Improperly denied defendant's motion to sever?

3. Improperly denied defendant's motion for changes of venue and/or venire said motion made both before and after co-defendant Mark Marinelli's plea of guilty?

4. Improperly denied defendant's motion to suppress statements made by defendant to police in violation of constitutional right to a speedy arraignment?

5. Improperly denied defendant's motion to suppress statements made by defendant to police in violation of right to counsel?

6. Failed to sustain defense counsel's objection to a death qualified jury?

---

[1] The appeal of a death sentence is directly to the Pennsylvania Supreme Court rather than to the Superior Court. See 42 Pa. C.S.A. § 9711(h).

7. Improperly permitted color and black and white photographs of the victim to be admitted when the prejudicial impact outweighed any probative or evidentiary value?

8. Improperly permitted a videotape depicting the body of the victim to be admitted when the prejudicial impact outweighed any probative or evidentiary value?

9. Improperly permitted a floor plan depicting the body of the victim to be admitted when the prejudicial impact outweighed any probative or evidentiary value?

10. Improperly permitted greatly enlarged photographic slides depicting the body of the victim to be admitted when the prejudicial impact outweighed any probative or evidentiary value?

11. Improperly denied defendant's motion for mistrial after counsel for co-defendant referred to defendant by name in his opening statement?

12. Improperly denied defendant's motion for severance after counsel for co-defendant referred to defendant by name in his opening statement?

13. Failed to provide defendant with Commonwealth witness Nathan Reigle's juvenile record?

14. Improperly denied defendant's motion to prevent Commonwealth witness Mark Marinelli from presenting testimony known by the Commonwealth to be untrue/untrustworthy?
15. Improperly admitted a drawing of crime scene drawn 5/24/94 by Commonwealth witness Mark Marinelli?

16. Improperly denied defendant's in chambers motion for mistrial after Commonwealth witness and co-defendant, Mark Marinelli, demanded, in the presence of the jury, to be permitted to stop testifying and that his testimony was not truthful?

17. Improperly denied defendant's motion for mistrial after Commonwealth witness, Mark Marinelli, while sequestered, was permitted to confer with counsel in the sheriff's holding cell, in the middle of his testimony, for over two (2) hours, outside the court's presence?

18. Improperly permitted Commonwealth witness Pennsylvania State Police Trooper Richard Bramhall to testify using improperly redacted statements made by co-defendant?

19. Failed to properly charge the jury on aggravating circumstance of torture?
20. Failed to charge the jury on voluntary intoxication?

21. Improperly charged the jury on degrees of murder by giving one instruction for first degree murder for defendant and a different instruction for first degree murder for co-defendant?

22. Improperly charged the jury on degrees of murder by giving an instruction for second degree murder for co-defendant to be used if defendant was found guilty of first degree murder?

23. Improperly permitted photographs and greatly enlarged slides, including autopsy, to be admitted during the penalty phase when the prejudicial impact outweighed any probative or evidentiary value?

24. Improperly denied defendant's motion to severance before summation?

25. Improperly denied defendant's motion for mistrial before summation?

(Doc. 27-2, App. I, Brief of Appellant at pp. 6-8).

The Pennsylvania Supreme Court affirmed the judgment of sentence upon direct appeal in an opinion dated February 25, 1997. See Marinelli-1, supra.

On July 25, 1997, Robert Dunham, Esquire from the Center for Legal Education Advocacy & Defense Assistance ("CLEADA"), filed a petition for writ of certiorari on behalf of Marinelli in the United States Supreme Court. (Doc. 27-5, App. L, Petition for Writ of Certiorari). Petitioner submitted the following grounds for relief:

I       Does the admission of a non-testifying codefendant's confession that contains references to another participant in a joint trial violate the Confrontation Clause and this Court's holdings in Bruton v. United States, 391 U.S. 123 (1968) and Richardson v. Marsh, 481 U.S. 200 (1987) when those references are redacted and replaced with the term "the other guy," but the use of the term "the other guy" unmistakably refers to the defendant?

II.     Should this Court grant certiorari to address the conflicting resolutions by the United States Courts of Appeal and the state courts concerning the question reserved by this Court in Richardson v. Marsh, 481 U.S. 200 (1987), whether the Confrontation Clause is violated by the admission at trial of a non-testifying co-

9

defendant's "confession in which the defendant's name
has been replaced with a symbol or neutral pronoun?"

III.   In the alternative, should this Court hold this petition for
       writ of certiorari pending its resolution of similar issues
       for which it granted certiorari in Gray v. Maryland, –
       U.S. --, 1997 WL 195045 (U.S. June 6, 1997)?

(Doc. 27-5, App. L, Petition for Writ of Certiorari at p. ii).

On March 23, 1998, the United States Supreme Court denied Marinelli's
petition for writ of certiorari. Marinelli v. Pennsylvania, 523 U.S. 1024 (1998).

Following disposition of the direct appeal, on April 28, 1998, Petitioner filed
a timely, *pro se* petition for relief under Pennsylvania's Post Conviction Relief
Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541 et seq. The following day, the
trial court again appointed Attorney Dunham to represent Marinelli in his petition
for collateral relief. On October 13, 1998, Attorney Dunham filed an Amended
PCRA petition on behalf of Marinelli. (Doc. 30-4, App. O, Amended PCRA
Petition, Commonwealth v. Marinelli, No. 94-451 (Northumberland. County, Oct.
13, 1998)). In that petition, Marinelli raised claims relating to the following areas:
(1) pretrial issues; (2) juror issues; (3) trial issues; (4) penalty phase issues; and (5)
sentencing issues. Id. Following an evidentiary hearing on the Amended PCRA
petition, from January 24, 2000 through January 27, 2000, newly appointed
counsel, Jerome Nickerson, from the Defender Association of Philadelphia, filed a

10

Second Amended PCRA petition. (Doc. 27-16, App. P, Second Amended

Petition). The Second Amended Petition added the following claim:

> Petitioner is entitled to a new trial because the Commonwealth
> withheld evidence that was exculpatory at guilt and sentencing in
> violation of Brady v. Maryland and elicited testimony which it knew
> or should have known to be false in violation of Giglio v. United
> States.

Id. By Opinion and Order dated May 15, 2001, the PCRA court denied the PCRA

petition. (Doc. 42, Ex. A, Opinion, Commonwealth v. Marinelli, No. 94-451

(Northumberland. County, May 15, 2001).

Marinelli, represented by Billy H. Nolas, Esquire, from the Defender

Association of Philadelphia, filed a timely appeal to the Pennsylvania Supreme

Court, raising the following issues:

> I.  Should Appellant's death sentence be vacated because he
>     was denied an impartial capital sentencing jury and, as a
>     result, consideration of mitigating evidence was
>     restricted, in violation of the Sixth, Eighth, and
>     Fourteenth Amendments and Article I, Sections 9 and
>     13?

> II. Is Appellant entitled to a new sentencing proceeding
>     because the court's penalty phase instructions improperly
>     shifted the burden of persuasion from the Commonwealth
>     to the defendant and violated the presumption of life
>     afforded defendants in capital sentencing proceedings, in
>     violation of the Sixth, Eighth and Fourteenth
>     Amendments?

11

III.   Is Appellant entitled to a new trial because juror Clara Iwanski was a former client of an Assistant District Attorney involved in this case?

IV.   Did the admission in this joint trial of the non-testifying co-defendant's confession, where the term "the other guy" unmistakably referred to Appellant, violate the Sixth, Eighth and Fourteenth Amendments?

V.   Should Appellant's death sentence be vacated because the sentencing jury was never instructed that, if sentenced to life, he would be statutorily ineligible for parole?

VI.   Was counsel ineffective in misapprising Appellant of his right to testify to personal background mitigating circumstances without being subject to cross-examination on the circumstances of the offense, and was Appellant's waiver of his right to testify in mitigation was invalid, in violation of the Sixth, Eighth and Fourteenth Amendments?

VII.   Is relief appropriate because the court failed to properly instruct on the nature and use of aggravating and mitigating factors, in violation of the Sixth, Eighth and Fourteen Amendments?

VIII.   Is Appellant entitled to the production of the remaining voir dire transcripts and restoration of his right to direct appeal, nunc pro tunc, because these notes of testimony of the voir dire proceedings were unavailable to him, in violation of due process under the Fourteenth Amendment?

IX.   Should Appellant's death sentence be vacated because the Pennsylvania Supreme Court failed to provide him meaningful proportionality review in violation of 42 Pa.C.S. 9711 (h)(3)(iii) and Pennsylvania and Federal Constitutional Law?

X.    Was the "torture" instruction, especially in conjunction with the prosecutor's argument, unconstitutionally vague, overbroad, arbitrary and capricious, in violation of the Sixth, Eighth and Fourteenth Amendments?

XI.   Should Appellant's conviction and death sentence be vacated because they were obtained by inflammatory, unscientific, unreliable and misleading "expert" testimony?

XII.  Is Appellant entitled to a new trial and should his death sentence be vacated because of errors under Brady v. Maryland and its progeny?

XIII. Was counsel ineffective at capital sentencing?

(Doc. 30-11, App. Q, Initial Brief of Appellant).

On November 25, 2002, the Pennsylvania Supreme Court issued its opinion in connection with Marinelli's appeal from the denial of his PCRA petition. Commonwealth v. Marinelli, 570 Pa. 622, 810 A.2d 1257 (Pa. 2002) ("Marinelli-2")(Doc. 27-9, App. R). The Court affirmed in part, and reversed in part, the order denying post-conviction relief, and remanded the case for further proceedings. See Marinelli-2, supra. Specifically, the Supreme Court concluded that the lower court had erred in its determination that claims I, II, III, V, VI, VII, VIII and IX were waived. Id. The case was remanded for the PCRA court to consider those eight (8) issues. Id. With respect to the remaining issues, the Supreme Court

determined that claim IV ("Did the admission in this joint trial of the non-testifying co-defendant's confession, where the term "the other guy" unmistakably referred to Appellant, violate the Sixth, Eighth and Fourteenth Amendments?") and claim X ("Was the 'torture' instruction, especially in conjunction with the prosecutor's argument, unconstitutionally vague, overbroad, arbitrary and capricious, in violation of the Sixth, Eighth and Fourteenth Amendments?") were previously litigated on direct appeal and therefore not appropriate for consideration on collateral review. Id. The Court rejected Marinelli's remaining three (3) claims (XI, XII and XIII) as meritless. Id.

On remand, the PCRA court concluded that all eight of Marinelli's claims (I, II, III, V, VI, VII, VIII and IX) were meritless and entered an order on March 30, 2004 denying post-conviction relief. (Doc. 42, Ex. B, Memorandum Opinion and Order). Marinelli filed an appeal to the Pennsylvania Supreme Court, challenging the lower court's determination that his eight (8) claims were meritless. (Doc. 30-13, App. T, Initial Brief of Appellant (After Remand).

In a November 7, 2006 Opinion, the Pennsylvania Supreme Court affirmed the order of the PCRA court order. Commonwealth v. Marinelli, 589 Pa. 682, 910 A.2d 672 (2006), reargument denied (Jan 24, 2007) ("Marinelli-3") (Doc. 27-11, App. W, Opinion).

14

By Order dated January 24, 2007, Marinelli's application for reargument was denied.

On January 30, 2007, Marinelli filed the instant action (Doc. 1). On August 10, 2007, Marinelli filed his petition for writ of habeas corpus, in which he alleges eighteen (18) claims for relief. (Doc. 9, Petition). Specifically, those claims are set forth as follows:

> I. Petitioner's convictions and death sentence should be vacated because his due process and confrontation rights were violated under Bruton v. United States and its progeny;
>
> II. Petitioner's convictions and death sentences should be vacated because his due process rights were violated under Brady v. Maryland and its progeny;
>
> III. Petitioner's convictions and death sentence should be vacated because his statements to police were obtained in violation of his Sixth Amendment right to counsel and should have been suppressed;
>
> IV. Petitioner's convictions and death sentence should be vacated because they were obtained with unscientific, unreliable and misleading "expert" testimony;
>
> V. Petitioner's convictions and death sentence should be vacated because the trial court prevented petitioner from effectively cross-examining Commonwealth witness Reigle;

VI. Petitioner's convictions and death sentence should be vacated because the Commonwealth presented evidence, from Mark Marinelli, that it knew to be unreliable;

VII. Petitioner's murder conviction and death sentence should be vacated because the guilt phase murder instructions violated due process;

VIII. Petitioner's convictions and death sentence should be vacated because he was denied his due process and Sixth Amendment rights to an impartial jury;

IX. Petitioner's convictions and death sentence should be vacated because his waiver of his right to testify was invalid;

X. Petitioner's death sentence should be vacated because trial counsel failed to reasonably investigate, develop and present mitigating evidence;

XI. Petitioner's death sentence should be vacated because the jury failed to give effect to mitigating evidence;

XII. Petitioner's death sentence should be vacated because of unconstitutional jury instructions and prosecutorial argument regarding torture;

XIII. Petitioner's death sentence should be vacated because the penalty phase instructions shifted the burden of persuasion from the Commonwealth to Petitioner and violated the presumption of life;

XIV. Petitioners' death sentence should be vacated because the sentencing jury was never instructed that, if sentenced to life, he would be ineligible for parole;

XV. Petitioners' death sentence should be vacated because the jury instructions' definition of mitigating

circumstances prevented the jury from giving full effect to mitigation;

XVI. Petitioner's death sentence should be vacated because the Pennsylvania Supreme Court failed to provide meaningful proportionality review;

XVII. Petitioner's convictions and death sentence should be vacated because of ineffective assistance of counsel at trial and on direct appeal; and

XVIII. Petitioner's convictions and death sentence should be vacated because of the cumulative prejudicial effect of the errors described in this petition.

(Doc. 9, Amended Petition). On May 12, 2008, a response to the petition was filed, and supporting exhibits were filed on May 19, 2008, June 6, 2008 and December 17, 2009). (See Docs. 26, 27, 30, 42). Marinelli filed his reply brief on July 31, 2008. (Doc. 36). This matter is ripe for disposition.

## III. STANDARDS OF REVIEW

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973). "[I]t is not

the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 68.

## A.     **Exhaustion and Procedural Default**

Habeas corpus relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant. See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Respect for the state court system requires that the petitioner demonstrate that the claims in question have been "fairly presented to

the state courts."[2] Castille v. Peoples, 489 U.S. 346, 351 (1989). To "fairly present" a claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999); see also Nara v. Frank, 488 F.3d 187, 197-98 (3d Cir. 2007) (recognizing that a claim is fairly presented when a petitioner presents the same factual and legal basis for the claim to the state courts). While the petitioner need not cite "book and verse" of the federal Constitution, Picard v. Connor, 404 U.S. 270, 278 (1971), he must "give the State 'the opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" before presenting those claims here, Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard, 404 U.S. at 275).

Under this exhaustion rule, a federal court must dismiss without prejudice habeas petitions that contain any unexhausted claims. Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004). This dismissal requirement does not apply, however,

---

[2] A petitioner bears the burden of demonstrating that he has "fairly presented" his claims to the state's highest court, either on direct appeal or in a state post conviction proceeding. Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). Further, pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under section 2254. See In re: Exhaustion of States Remedies in Criminal and Post-Conviction Relief Cases, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam).

in cases where the state courts would not consider the unexhausted claims because they are procedurally barred by state law. Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996). However, in that situation the petitioner must still overcome the concomitant doctrine of procedural default. Id. at 683.

The doctrine of procedural default bars federal habeas relief when a state prisoner has defaulted on his federal claims in state court pursuant to an independent and adequate state procedural rule. Id. For example, failure to present federal habeas claims to the state courts in a timely fashion results in procedural default. See O'Sullivan, 526 U.S. at 848 (citing Coleman v. Thompson, 501 U.S. 722, 731-32 (1991)). Like a state prisoner who has failed to exhaust his state remedies, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732. The doctrine of procedural default therefore ensures that a state prisoner cannot evade the exhaustion requirement of § 2254 by defaulting his federal claims in state court. Id.

However, a federal habeas court can review the merits of procedurally defaulted claims if the petitioner demonstrates either cause for the procedural default and actual prejudice, or that a fundamental miscarriage of justice will result

if the court does not review the claims. See McCandless, 172 F.3d at 260; Coleman, 501 U.S. at 750-51; Caswell v. Ryan, 953 F.2d 853, 861-62 (3d Cir. 1992). To demonstrate "cause" for a procedural default, the petitioner must show that some objective external factor impeded petitioner's efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). To demonstrate "actual prejudice," the petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). To establish such a claim, a petitioner must "support his allegations of constitutional error with

21

new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). Further, actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." Id. at 329.

Respondents challenge the following claims as being unexhausted and procedurally defaulted.

### Claim III

**Petitioner's convictions and death sentence should be vacated because his statements to police were obtained in violation of his Sixth Amendment right to counsel and should have been suppressed.**

In addition to the Sixth Amendment violation, Petitioner also includes the claim that he was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel at trial and on direct appeal, when counsel failed to effectively litigate the suppression issue. (See Doc. 18-2, Memorandum of Law at p. 45). Respondents submit that because the issue of ineffective assistance of counsel, in connection with the suppression issue, was never presented to the Pennsylvania state courts, Marinelli is now procedurally barred from raising

this claim before the Pennsylvania courts, and has procedurally defaulted the claim, preventing it from federal review. For the reasons set forth below, the Court agrees.

On direct appeal to the Pennsylvania Supreme Court, Marinelli raised the following issues regarding his Sixth Amendment right to counsel:

IV.   Did the trial court commit error when it:

4.   Improperly denied Defendant's motion to suppress statements made by Defendant to police in violation of Constitutional right to a speedy arraignment?

5.   Improperly denied Defendant's motion to suppress statements made by Defendant to police in violation of right to counsel?

(Doc. 27-2, App. I, Brief of Appellant at pp. 13, 17). The Pennsylvania Supreme Court addressed these issues as trial court errors. (See Doc. 27-4, App K, Marinelli-1 at pp 15-18).

Petitioner next raises his Sixth Amendment issue as a "preserved claim" in his Initial Brief of Appellant (After Remand), filed in the Pennsylvania Supreme Court on January 10, 2005. (Doc. 30-13, App. T, Initial Brief of Appellant (After Remand) at pp. 90-91). Petitioner's issue reads as follows:

Preserved Claim F. Appellant's conviction and death sentence are unconstitutional under Michigan v. Jackson, 475 U.S. 625 (1986) and related precedents.

23

Id. However, within his discussion of the claim, Petitioner makes the following

statement: "Moreover, counsel was ineffective by failing to appropriately argue

this claim on direct appeal". Id. at p. 91. In addressing Petitioner's Sixth

Amendment claim, the Pennsylvania Supreme Court found the following:

> In Part III of his Brief, Appellant raised six so-called "Preserved
> Claims", which were already decided by this Court" but were
> included in the brief "to avoid any suggestion he had waived them"
> (Brief of Appellant at v-vi, 49-91). In particular, Appellant argues
> that: (1) the redaction of Kirchoff's incriminating statement was
> constitutionally inadequate; (2) the trial court's torture instruction was
> unconstitutionally vague and overbroad; (3) the expert testimony of
> forensic pathologist Isadore Mihalakis, M.D., which the
> Commonwealth presented, was unscientific, unreliable, and
> misleading; (4) the Commonwealth violated Brady v. Maryland, 373
> U.S. 83 (1963), and its progeny; (5) trial counsel was ineffective for
> failing to investigate, develop, and present mitigating evidence; and
> **(6) the police violated Appellant's right to counsel when they
> interrogated him in the absence of counsel.**
>
> We considered the merits of each of these claims on either direct or
> collateral review of Appellant's convictions and Judgments of
> Sentence. See Commonwealth v. Marinelli, 690 A.2d at 220-21 (Pa.
> 1997) (denying first claim on its merits); id. (second claim);
> Commonwealth v. Marinelli, 810 A.2d 1257, 1266-70 (Pa. 2002)
> (third claim); id. At 1270-74 (fourth claim); id. At 1274-77 (fifth
> claim); **Marinelli, 690 A.2d at 215-16 (sixth claim).** Therefore, by
> Appellant's own concession, these claims are previously litigated.
> See 42 Pa.C.S. § 9544(a)(2). Appellant is thus not entitled to relief on
> these claims.

(Doc. 27-11, App. W, Marinelli -3 at p. 8, fn 12)(emphasis added).

Although the issue of effective assistance of counsel was brought to the attention of the Pennsylvania Supreme Court on appeal from the PCRA remand decision, the issue was never presented to the PCRA court. As such, the issue is procedurally defaulted. To the extent that Petitioner references that this issue was raised in a separate petition for writ of habeas corpus, filed with the Pennsylvania Supreme Court, (see doc. 18-2, Memorandum of Law at p. 48), no petition for writ of habeas corpus has been filed with this court as an exhibit, and any attempt to obtain a copy from the Pennsylvania Supreme Court was fruitless, as communication with the Pennsylvania Supreme Court revealed that such document no longer exists with the Court.[3] Moreover, with respect to Petitioner's argument that the Pennsylvania Supreme Court denied his ineffective assistance of counsel claim as "previously litigated", (see doc. 36, Petitioner's reply at p. 4), it is apparent from the Court's opinion that only the Sixth Amendment claim was determined to be previously litigated. As such, the ineffective assistance of counsel claim in connection with his Sixth Amendment right to counsel claim remains unexhausted.

---

[3]Should Petitioner be able to produce such document to the Court, he has the remedy of a motion for reconsideration of this Court's analysis regarding his ineffective assistance of counsel claim.

As discussed above, a claim is procedurally defaulted if the petitioner failed to exhaust his state court remedies and is barred from presenting his claim to the state courts due to an independent and adequate state procedural rule. Coleman, 502 U.S. at 732. Marinelli's claim relating to counsel's ineffectiveness in pursuing his Sixth Amendment claim is unexhausted because he never presented it to the state courts, either on direct appeal or collateral attack. However, a new state habeas petition would be deemed time-barred under Pennsylvania law, see 42 Pa. Cons. Stat. Ann. § 9545(b) (requiring the filing of any petition for post conviction relief, including a second or successive petition, within one year of the date the judgment becomes final),[4] and thus exhaustion is excused, but the claim is deemed procedurally defaulted. In order to have the Court consider the merits of his claim, Marinelli must show "cause and prejudice" or a "fundamental miscarriage of justice" to excuse default. Petitioner has not alleged a finding of cause and prejudice and/or miscarriage of justice sufficient to excuse the procedural default.

---

[4] The time period for filing a second PCRA petition has expired. See 42 Pa. Cons. Stat. Ann. § 9545(b)(1) (setting a one year limitations period). Marinelli raises no argument, and the record suggests no possibility, that his claim falls within any exception to the limitations period for filing a petition under the PCRA. See id. (permitting petitions to be filed more than one year after judgment if the failure to raise the claim is attributable to government interference, the facts underlying the claim could not have been ascertained previously, or the claim involves rights newly recognized and retroactively applied by the Supreme Court).

Consequently Petitioner's claim that counsel was ineffective for failing to pursue his Sixth Amendment claims is dismissed, without consideration on the merits. Petitioner's claim that his convictions and death sentence should be vacated because his statements to police were obtained in violation of his Sixth Amendment right to counsel and should have been suppressed, will proceed on the merits.

### Claim V

**Petitioner's convictions and death sentence should be vacated because the trial court prevented Petitioner from effectively cross-examining Commonwealth witness Reigle.**

Petitioner claims that his due process and Sixth Amendment confrontation rights were violated when the trial court denied trial counsel's request that the defense be allowed to inspect Reigle's juvenile record; informed trial counsel only of some limited information about that record that the trial court gleaned from *in camera* inspection; and restricted counsel's cross-examination regarding that record to the fact of Reigle being on probation. (Doc. 18-2, Memorandum of Law at p. 69).

Petitioner presented this issue on direct appeal, as follows:

IV. Did the trial court commit error when it:

13. Failed to provide Defendant with Commonwealth
Witness Nathan Reigle's juvenile record?

(Doc. 27-2, App. I, Brief of Appellant at pp. 25, 26). His supporting argument

contained the following:

> Nathan Reigle was a witness at the Preliminary Hearing of Appellant
> and he was expected to and did testify at trial. It was understood by
> the defense that Nathan Reigle had an extensive juvenile record and
> was on probation. On April 18, 1995, Appellant filed a motion to be
> provided with the juvenile record Nathan Reigle.
>
> A defendant is permitted access to the juvenile record of a
> Commonwealth witness to determine if there is anything in the
> witness' record which would indicate that the witness might be biased
> against the defendant and in favor of the prosecution . . . Appellant
> was not permitted access to the witness' juvenile record. Appellant
> was therefore unable to effectively cross-examine the witness in
> violation of the Confrontation Clause.

Id. The Pennsylvania Supreme Court addressed the issue in the following manner:

> Next, appellant contends that he was unable to effectively cross
> examine prosecution witness Nathan Reigle, in violation of his
> constitutional rights under the Confrontation Clause,[5] because the trial
> court denied his request to have the Commonwealth provide Reigle's
> juvenile record . . . Nathan Reigle's juvenile record was disclosed by
> the trial court to counsel for both defendants, including the fact that
> Reigle was currently on juvenile probation. Further, Reigle's juvenile
> probationary status and possible bias or agreements with the

---

[5]Appellant relies on both Davis v. Alaska, 415 U.S. 302, 94 S.Ct. 1105, 39
L. Ed. 2d 347 (1974), and Commonwealth v. Simmons, 521 Pa. 218, 555 A.2d 860
(1989), but does not specify whether his objection is under the United States
Constitution, the Pennsylvania Constitution, or both.

prosecution were brought out at trial by the Commonwealth. There is thus no merit to appellant's contention that he was denied an opportunity to confront the prosecution's witness.

(See Doc. 27-4, App K, Marinelli-1 at pp 24-25).

Petitioner, however, argues that the Pennsylvania Supreme Court failed to address the actual claim presented on direct appeal, that is, "that the trial court's *in camera* inspection was insufficient and that actual access to the record by the defense was required. Since the state court did not address the actual claim, habeas review is *de novo*." (Doc. 18-2, Memorandum of Law at p. 72). The Court finds this argument unpersuasive.

Marinelli never presented a due process challenge or alleged that the trial court's *in camera* inspection was insufficient on direct appeal. Instead, his argument dealt with the issue of whether he was afforded the opportunity to effectively cross-examine Reigle. Moreover, Marinelli never asserted on appeal in state court that he should have been permitted to impeach Reigle with his adjudication for a *crimen falsi offense*. As such, these claims cannot now be entertained, as they are procedurally defaulted. Because Marinelli offers no explanation to excuse the default, such challenges will be dismissed without consideration on the merits.

## Claim VI

**Petitioner's convictions and death sentence should be vacated because the Commonwealth presented evidence, from Mark Marinelli, that it knew to be unreliable.**

Petitioner claims that when Mark Marinelli failed a polygraph, the Commonwealth found his testimony to be too unreliable to justify a third degree murder plea bargain and, instead, offered only a plea to second degree murder with a life without parole sentence. (Doc. 9, Amended Petition at p. 63). Petitioner further claims that the Commonwealth, however, then presented this testimony, and the jury was not allowed to learn that the Commonwealth deemed the testimony too unreliable to justify a third degree plea bargain. Moreover, Petitioner argues that the Commonwealth stressed the harshness of the second degree/life-without-parole deal, and the jury was not allowed to learn that this deal came about only after the earlier deal was withdrawn when Mark failed the polygraph. Id. Thus, Petitioner claims that these circumstances violated Petitioner's due process and Eighth Amendment rights.

On Appeal to the Pennsylvania Supreme Court, Petitioner presented this issue as follows:

IV.  Did the trial court commit error when it:

30

> 14. Improperly denied Defendant's motion to prevent
> Commonwealth witness Mark Marinelli from presenting
> testimony known by the Commonwealth tot be
> untrue/untrustworthy?

(Doc. 27-2, App. I, Brief of Appellant at p. 26). His argument in support

contained, in relevant part, the following:

> On May 26, 1994, the Commonwealth offered co-defendant, Mark
> Marinelli a plea to third degree murder on the condition that he pass a
> polygraph test. He did not pass and the offer was withdrawn. On
> April 20, 1995, co-defendant Mark Marinelli entered into a plea
> agreement for second degree murder/life in prison without parole in
> exchange for his testimony for the Commonwealth.
>
> A prosecutor has a duty to seek justice, not just to convict. A
> prosecutor also has an "affirmative and continuing duty to disclose
> exculpatory information to the defendant and to correct false
> testimony of a witness." . . . In the instant case the Commonwealth
> withdrew its original plea offer to co-defendant Mark Marinelli based
> on his failure of a polygraph test, only later to have him testify to the
> same information they considered unreliable in making a deal. Mark
> Marinelli's testimony was key to the Commonwealth's case. . . It is
> likely that Mark Marinelli's testimony affected the judgment of the
> jury. Because the Commonwealth presented a witness they knew or
> should have known was unreliable and did not disclose this to the
> factfinder, a new trial is required.

Id. at pp. 26-28. In treating the issue solely as a claim of trial court error, the

Pennsylvania Supreme Court stated:

> In his next argument, appellant asserts that the trial court improperly
> denied his motion to prevent Mark from presenting testimony known
> to the Commonwealth to be untrue and/or untrustworthy. Appellant
> contends that the Commonwealth knew Mark's testimony was

31

untrustworthy because he failed to pass a polygraph test, passage of which was a condition of Mark's entry of a guilty plea to third degree murder. Appellant asserts that when Mark did not pass this polygraph test, the Commonwealth later entered a deal with Mark whereby he entered a guilty plea to second degree murder/life imprisonment, without parole, in exchange for his testimony.

The issue as to Mark's testimony was one of credibility. The results of the polygraph examination taken by Mark would not be admissible into evidence because of their lack of scientific accuracy.

(See Doc. 27-4, App K, Marinelli-1 at p. 26).

Petitioner argues that the Pennsylvania Supreme Court "misses the point of this claim, which is that the *prosecution* knew Mark's testimony was unreliable", because, "in light of the actual claim, the inadmissibility of the polygraph makes the prosecution's conduct even *worse*, because the defense had no way to show the jury that the prosecution knew Mark to be unreliable." (See Doc. 18-2, Memorandum of Law at p. 78) (emphasis in original). The Court finds no merit to Petitioner's argument. In connection with the above issue, the Pennsylvania Supreme Court addressed Petitioner's issue that the trial court improperly denied Petitioner's in-chambers motion for mistrial, made after Mark, while on the witness stand and in the presence of the jury, demanded to stop testifying and indicated that his testimony was untruthful. (See Doc. 27-4, App K, Marinelli-1 at pp. 27-28). In addressing this claim, the Supreme Court found that:

> When Mark's testimony resumed, each party's counsel had a opportunity to question him as to his outburst and the truthfulness of his testimony, and Mark indicated that he had not been lying during his testimony prior to his outburst. . . It was then up to the jury to determine the credibility of Mark's testimony in light of his outburst.
>
> We conclude that Mark's outburst did not deny appellant a fair trial. Indeed, Mark's outburst was prejudicial to the Commonwealth, if anyone, because it suggested to the jury that the Commonwealth had elicited false testimony from Mark. In light of counsel's subsequent exploration of whether Mark's testimony prior to his outburst had been truthful, we find no abuse of the trial court's discretion in denying appellant's motion for mistrial.

Id. Thus, it is apparent from the Pennsylvania Supreme Court's opinion, that the issue of the admissibility of Mark's testimony was addressed. However, the Supreme Court addressed the issue as one of trial court error, and not as an Eighth Amendment or due process claim. As such, Petitioner has never fairly presented Claim VI to the Pennsylvania state courts. Since he cannot seek review of this claim in state court now, the claim is procedurally defaulted and precluded from federal review. Moreover, because Petitioner does not allege in his petition a finding of cause and prejudice and/or miscarriage of justice sufficient to excuse the procedural default, the claim will be dismissed, without consideration on the merits.

33

## Claim VII

**Petitioner's murder conviction and death sentence should be vacated because the guilt phase murder instructions violated due process.**

Petitioner claims that the guilt phase murder instructions violated due process because they presumed Petitioner was the cause of death; relieved the Commonwealth of its burden of proving every element of murder by proof beyond a reasonable doubt; directed a finding for the Commonwealth on a critical matter; and provided no outlet for the jury to give effect to the defense theory of the case. (Doc. 9, Amended Petition at p. 64). In his memorandum of law in support of his petition, Marinelli states that "the guilt phase jury instructions on murder violated Petitioner's due process and Sixth Amendment rights." (Doc. 18-2, Memorandum of Law at p. 78).

This issue was raised on direct appeal as follows:

IV.  Did the trial court commit error when it:

> 21. Improperly charged the jury on degrees of murder by giving one instruction for first degree murder for defendant and a different instruction for first degree murder for co-defendant?

> 22. Improperly charged the jury on degrees of murder by giving an instruction for second degree murder for co-defendant to be used if defendant was found guilty of first degree murder?

(Doc. 27-2, App. I, Brief of Appellant at p. 33).

On direct appeal, the Supreme Court considered Petitioner's argument to be as follows:

> Finally, appellant asserts that it was prejudicial error for the trial court to give separate charges for first and second degree murder and to refer to the impact of appellant's guilt in the charges regarding the proof needed to convict co-defendant Kirchoff. Moreover, appellant urges that the trial judge's charging the jury on accomplice liability with regard to codefendant Kirchoff, but not appellant, had the effect of directing the jury to find appellant guilty of first degree murder while considering Kirchoff as an accomplice. Appellant argues that the jury charge as a whole had the general effect of directing the jury that they could find appellant guilty of nothing less than first degree murder.

(See Doc. 27-4, App K, Marinellie-1 at p. 33).

In analyzing the above claim, the Supreme Court held that:

> "A verdict will not be set aside if the instructions of the trial court, taken as a whole, and in context, accurately set forth the applicable law." Bracey, 541 Pa. at 335-36, 662 A.2d at 1068.

> The trial court instructed the jury separately as to each defendant on first degree murder and second degree murder because of the question as to whether appellant used a deadly weapon on a vital part of Dumchock's body. The trial court instructed the jury as to accomplice liability regarding Kirchoff's participation in the killing because only Kirchoff, and not appellant, was charged as an accomplice to the killing.

> Our review of the trial court's instructions reveals that the trial court accurately set forth the applicable law as to all degrees of murder as

35

> well as accomplice liability, leaving the degree of murder to the jury
> to determine for each defendant. See Commonwealth v. Joseph, 451
> [7]Pa. 440, 304 A.2d 163 (1973); Commonwealth v. Gibbs, 366 Pa. 182,
> 76 A.2d 608 (1950). We find no merit to appellant's arguments.

Id. at pp. 33-34. As is apparent from the manner in which the issue was framed,

and from the Pennsylvania Supreme Court's analysis, Marinelli did not fairly

present his due process and Sixth Amendment constitutional challenges to the

Pennsylvania Supreme Court. While the Court agrees with Petitioner's argument

that a Petitioner may assert a federal claim without explicitly referencing specific

portions of the federal constitution, see Evans v. Court of Common Pleas, Del.

County, Pa., 959 F.2d 1227, 1232 (3d Cir.1992)(holding that a federal claim can be

conveyed through (a) reliance on pertinent federal cases employing constitutional

analysis, (b) reliance on state cases employing constitutional analysis in like fact

situations, (c) assertion of the claim in terms so particular as to call to mind a

specific right protected by the Constitution, and (d) allegation of a pattern of facts

that is well within the mainstream of constitutional litigation),  the Court finds that,

here, Petitioner did not serve fair notice to the state courts that he was asserting

violations of the Sixth Amendment due process rights that jury instructions, among

other things, must hold the prosecution to its burden of proving every element of

the offense by proof beyond a reasonable doubt, see e.g., In Re. Winship, 397 U.S. 358, 361-64 (1970); Francis v. Franklin, 471 U.S. 307, 313-15 (1985); Carella v. California, 491 U.S. 263, 265 (1989); and United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007); never direct a finding for the prosecution on any element of the offense, see e.g., Sullivan v. Louisiana, 508 U.S. 275, 277 (1993); United States v. Martin Linen Supply Co., 430 U.S. 564, 572-73 (1977); and United States v. Defries, 129 F.3d 1293, 1311-12 (D.C. Cir. 1997); and allow the jury to give full effect to the defense theory of the case, see e.g., Cool v. United States, 409 U.S. 100, 104 (1972); Crane v. Kentucky, 476 U.S. 683, 690 (1986); Strauss v. United States, 376 F.2d 416, 419 (5th Cir. 1967); Zemina v. Solem, 438 F. Supp. 455, 467 (D. S.D. 1977), aff'd, 573 F.2d 1027 (8th Cir. 1978) (per curiam); United States v. Hicks, 748 F.2d 854, 857-58 (4th Cir. 1984): Conde v. Henry, 198 F.3d 734, 739-40 (9th Cir. 2000). Petitioner's claims in state court made no reference to a constitutional or federal right and cited only state cases, without employing any constitutional analysis. Moreover, Petitioner's Supreme Court brief does not assert these claims in "terms so particular as to bring to mind" a constitutional right, nor does he "allege a pattern of facts well within the mainstream of constitutional litigation." McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir.1999) (citing Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S.

270, 275 (1971); <u>Lambert v. Blackwell</u>, 134 F.3d 506, 513 (3d Cir. 1997)). To "fairly present" a claim to a federal habeas court, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted. <u>McCandless</u>, 172 F.3d at 261 (citing <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) and <u>Picard</u>, 404 U.S. 270). It is not sufficient that a "somewhat similar state-law claim was made." <u>Id</u>. (citing <u>Harless</u>, 459 U.S. at 6). Thus, Petitioner's due process and Sixth Amendment claims are procedurally defaulted because he failed to properly present them to the state courts.

## Claim XVII

**Petitioner's convictions and death sentence should be vacated because of ineffective assistance of counsel at trial and on direct appeal.**

Petitioner states that "to the extent that counsel failed to reasonably raise and litigate at trial and on direct appeal the errors described throughout this Petition, Petitioner was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel, and his convictions and death sentence should be vacated." (Doc. 9, Amended Petition at p. 75).

Respondent argues that his claim is redundant to the ineffectiveness claims that are raised in connection with the individual claims, (<u>see</u> doc. 27, complete

answer at p. 26), and Petitioner agrees. (Doc. 36, Petitioner's reply brief at p. 20). Thus, the Court will not separately consider this claim.

Nevertheless, the Court is not precluded from addressing the merits of the exhausted claims. See Wenger, 266 F.3d at 227-28 ("A petition containing unexhausted but procedurally barred claims in addition to exhausted claims, is not a mixed petition requiring dismissal under Rose [v. Lundy, 455 U.S. 509 (1982)]. Although the unexhausted claims may not have been presented to the highest state court, exhaustion is not possible because the state court would find the claims procedurally defaulted. The district court may not go to the merits of the barred claims, but must decide the merits of the claims that are exhausted and not barred.") (quoting Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993)).

**B.   Merits' Standard**

Section 2254(d) of Title 28 of the United States Code provides, in pertinent part, that an application for a writ of habeas corpus premised on a claim previously adjudicated on the merits in state court shall not be granted unless:

> (1) [the decision] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) [the decision] was based on an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d). To establish that the decision was contrary to federal law, "it

is not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must

demonstrate that Supreme Court precedent *requires* the contrary outcome."

Matteo v. Superintendent, 171 F.3d 877, 888 (3d Cir. 1999) (emphasis in original).

Similarly, a federal court will only find a state court decision to be an unreasonable

application of federal law if the decision, "evaluated objectively and on the merits,

resulted in an outcome that cannot reasonably be justified under existing Supreme

Court precedent." Id. at 890.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume

that a state court's findings of fact are correct. A petitioner may only rebut this

presumption with clear and convincing evidence of the state court's error. §

2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (stating that the clear

and convincing standard in § 2254(e)(1) applies to factual issues, whereas the

unreasonable application standard of § 2254(d)(2) applies to factual decisions);

Matteo, 171 F.3d at 888; Thomas v. Varner, 428 F.3d 491, 497-98 (3d Cir. 2005).

This presumption of correctness applies to both explicit and implicit findings of

fact. Campbell v. Vaughn, 209 F.3d 280, 285-86 (3d Cir. 2000). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 598 (1st Cir. 2000).

Like the "unreasonable application" prong of paragraph (1), a factual determination should be adjudged "unreasonable" under paragraph (2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. 28 U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); see also Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000); cf. Jackson v. Virginia, 443 U.S. 307, 317 (1979). "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." Breighner v. Chesney, 301 F. Supp. 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[6]). "Mere disagreement with the state court's determination, or even erroneous

---

[6] "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the state court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination." 28 U.S.C. § 2254(f).

factfinding, is insufficient to grant relief if the Court acted reasonably." Porter, 276 F. Supp. 2d at 296; see also Williams v. Taylor, 529 U.S. 362, 410 (2000); Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001). Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination. Breighner, 301 F. Supp.2d at 369 (citing Porter, 276 F. Supp. 2d at 296; Williams, 529 U.S. at 408-10).

Further, the United States Supreme Court has clarified the test a district court must apply before granting relief where the court finds constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in [Brecht, supra, 87 S.Ct. 824, 17 L.Ed.3d 705, 507 U.S. 619 (1993], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in [Chapman v. California,] 386 U.S. 18 (1967).

Fry v. Pliler, 551 U.S. 112, 121-22 (2007). Thus, even if the Court concludes that constitutional error occurred in the state court, the Court may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 631; see also Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008). See also O'Neal v. McAninch, 513 U.S. 432, 436 (1995)

42

("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.") (quotations omitted).

Of course, AEDPA scrutiny is applicable only if the state court adjudicated the petitioner's claims "on the merits." 28 U.S.C. § 2254(d); see Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). " An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004), rev'd on other grounds, Rompilla v. Beard, 545 U.S. 374 (2005) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)). Further, an "adjudication on the merits" can occur at any level of state court. Thomas v. Horn, 570 F.3d 105, 115 (3d Cir. 2009). However, "to qualify as an 'adjudication on the merits,' the state court decision must finally resolve the claim. This means that the state court's resolution of the claim must have preclusive effect." Id.[7] (citing Rompilla,

---

[7] In Thomas, the Third Circuit Court of Appeals was presented with a question of whether a claim has been "adjudicated on the merits" in state court proceedings when a lower state court decided the claim on the merits, but the appellate state court resolved the claim entirely on procedural grounds. Thomas, 570 F.3d at 114. The Commonwealth argued in that case that the PCRA court's decision on the merits with respect to two claims presented in the federal habeas

petition was an "adjudication on the merits," rendering § 2254(d) applicable to those two claims. Id. However, the petitioner contended that the Pennsylvania Supreme Court's determination that those claims were waived because they had not been raised in the amended PCRA petition superceded the PCRA court's decision on the substantive grounds. (Id.) The Third Circuit Court rejected the Commonwealth's argument, holding

> Applying this rule [that to qualify as an "adjudication of the merits," the state court decision's must have preclusive effect] to the state court decisions here, we see no "adjudication on the merits." Here, the Pennsylvania Supreme Court decided Thomas' claims on purely procedural, not substantive, grounds. This decision stripped the PCRA court's substantive determination of Thomas' claims of preclusive effect. See Restatement (Second) of Judgments § 27 cmt. o (1982) ("If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result . . . [and] [i]f the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination."); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4432 (2d ed. 2002) ("If the appellate court terminates the case by final rulings as to some matters only, preclusion is limited to the matters actually resolved by the appellate court . . . ."); see also, e.g., Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 327-28 (4th Cir. 2005) (holding that, although the trial court reversed an administrative determination on, inter alia, Constitutional grounds, res judicata did not apply to the Constitutional claims because the appellate court affirmed the trial court's decision without reaching the Constitutional issues). The

355 F.3d at 247 (quoting Sellan, 261 F.3d at 311)). Where a state court has not

reached the merits of a claim thereafter presented to a federal habeas court, the

deferential AEDPA standards do not apply, and the federal court must exercise de

novo review over pure legal questions and mixed questions of law and fact.

Simmons v. Beard, No. 05-9001, 2009 WL 2902251, at *6 (3d Cir. Sept. 11, 2009)

(citing Appel, 250 F.3d at 210) (precedential). However, the state court's factual

determinations are still presumed to be correct, rebuttable upon a showing of clear

and convincing evidence.[8] Simmons, 2009 WL 2902251, at *6 (citing Appel, 150

F.3d at 210).

> Pennsylvania Supreme Court's procedure-based decision remains as the only resolution of Thomas' claims with preclusive effect. Accordingly, there has been no "adjudication on the merits," and AEDPA deference is not due. See also Liegakos v. Cooke, 106 F.3d 1381, 1385 (7th Cir. 1997) (noting that Section 2254(d) did not apply to claims decided on the merits in state trial court, but disposed of on procedural grounds in the state court of appeals because "the disposition of the last state court to issue an opinion determines whether the state has invoked a ground of forfeiture" (citing Ylst v. Nunnemaker, 501 U.S. 797 (1991))).
>
> Thomas, 570 F.3d at 115-16.

[8] In fact, "the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d)." Thomas, 570 F.3d at 116 (quoting Nara, 488 F.3d at 200-01).

# IV. DISCUSSION

### Claim I

**Petitioner's convictions and death sentence should be vacated because his due process and confrontation rights were violated under Bruton v. United States, and its progeny.**

Petitioner contends that, although neither he, nor his co-defendant, Thomas Kirchoff, testified at trial, the prosecution introduced Kirchoff's statement, which was highly inculpatory of Petitioner, after "redacting" it by replacing Petitioner's name with the phrase "the other guy." (Doc. 18, Memorandum of Law at p. 9-10). He argues that "it was patently obvious to the jury that 'the other guy' was Petitioner; moreover, the 'redaction' repeatedly was broken and Petitioner expressly identified as 'the other guy'." Id. As such, Petitioner contends that he is entitled to habeas relief because his Confrontation Clause and due process rights were violated when he could not confront and cross-examine Kirchoff. Id.

The Confrontation Clause guarantees a defendant's right "to be confronted with the witnesses against him." U.S. Const. Amend. VI. This right includes the ability to cross-examine witnesses. See Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965).

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the Confrontation Clause was violated by the admission of a non-testifying co-

46

defendant's statement implicating the petitioner by name in the crime, despite an instruction that the jury not consider the statement against the defendant. In 1987, the Supreme Court decided Richardson v. Marsh, 481 U.S. 200 (1987). Marsh made clear that, in addition to forbidding the introduction of a "facially incriminating confession of a nontestifying co-defendant," id. at 207, the Confrontation Clause also prohibits the government from seeking "to undo the effect of [a] limiting instruction by urging the jury to use [the co-defendant's] confession in evaluating [the defendant's] case." Id. at 211. The Court left open the question whether "a confession in which the defendant's name has been replaced with a symbol or neutral pronoun" violates the Confrontation Clause.[9] Id. at 211 n. 5.

---

[9] The Supreme Court resolved that question in Gray v. Maryland, 523 U.S. 185 (1998), holding that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration" also violate the Confrontation Clause, id. at 192. Because Gray was decided after the Pennsylvania Supreme Court addressed Marinelli's Bruton claim, however, we do not consider it in our analysis of whether the Commonwealth's adjudication of that claim involved an unreasonable application of "clearly established Federal law." See 28 U.S.C. § 2254(d)(1); Greene v. Palakovich, 606 F.3d 85, 94–95 (3d Cir.2010) (holding that the date of the "relevant state-court decision" controls for purposes of determining what constitutes "clearly established Federal law" under § 2254(d)(1)).

In <u>Bruton</u>, the defendant was tried together with codefendant Evans on the charge of armed postal robbery. Evans did not testify, but a postal inspector testified that Evans confessed that he and Bruton committed the robbery, and the judge instructed the jury not to consider Evans' confession as evidence against Bruton. 391 U.S. at 124-25. Overruling its prior holding to the contrary, the Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton]'s guilt, admission of Evans' confession in this joint trial violated [Bruton]'s right of cross-examination secured by the Confrontation Clause." <u>Id</u>. at 126. In identifying the evil sought to be avoided by its holding, the Court focused on the weight likely to be given to the "powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant." <u>Id</u>. at 135-36. "The unreliability of such evidence is intolerably compounded when the alleged accomplice. . .does not testify and cannot be tested by cross-examination." <u>Id</u>. at 136. By its terms, the Court's holding does not rest on the

fact that Evans' statement named Bruton, but rather that Evans' statement "inculpat[ed]" and was "powerfully incriminating" as to Bruton. Id. at 126, 137.[10]

In Marsh, a woman named Knighton survived a shooting in which her son and aunt were killed. Defendants Marsh and Williams were tried jointly for the assault and murders. 481 U.S. at 202. Another defendant, Martin, who was Marsh's boyfriend, was a fugitive at the time of trial. Knighton testified that she and her son and aunt, Ollie Scott, were at Scott's home when Marsh, Martin, and later Williams, arrived. Both Martin and Williams were armed. Some time later, Martin and Williams forced the three victims to the basement and shot them. Id. at 202-04.

The state introduced Williams' confession at trial. The confession was redacted before being read to the jury so that it made no reference to any perpetrator other than Williams and Martin. For example, the jury heard Williams say that "[Martin] went up to the house and went inside. A couple minutes later I moved the car and went up to the house. As I entered, [Martin] and this older lady

---

[10]Justice Stewart put it this way: "I think it is clear that the underlying rationale of the Sixth Amendment's Confrontation Clause precludes reliance upon cautionary instructions when the highly damaging out-of-court statement of a codefendant, who is not subject to cross-examination, is deliberately placed before the jury at a joint trial." 391 U.S. at 137-38 (Stewart, J., concurring).

were in the dining room, a little boy and another younger woman were sitting on the couch in the front room. I pulled my pistol and told the younger woman and the little boy to lay on the floor." Id. at 203 n. 1. According to Williams' statement, he and Martin discussed the armed robbery plan as they drove together to Scott's house. Id.

Williams did not testify at trial, but Marsh did. She testified that on Martin's suggestion the three drove together to Scott's house to borrow money. During the drive, Marsh testified that she was unable to hear the conversation Martin and Williams were having in the front seat. She denied knowledge that Martin and Williams were armed or that they intended to rob or kill anyone. Id. at 204. Marsh's testimony was the only evidence offered in the case that she was with Williams and Martin as they drove to Scott's house. Thus, even though Williams' statement did not place Marsh in the car, when considered together with Marsh's testimony, it allowed the inference that Marsh heard them discussing the armed robbery plan.

The Supreme Court began with the holding of Bruton: "[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying co-defendant is introduced at their joint trial." Id. at 207 (emphasis added). In contrast to Bruton, where "at the time that

confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating,' " Williams' confession became incriminating as to Marsh only once Marsh took the stand and testified that she was in the car with Williams and Martin. Id. at 208. The Court found this distinction critical to the Confrontation Clause analysis, because "[s]pecific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." Id. at 208. Also, excluding a statement that will only be incriminating by inference when linked with other evidence would be impractical, as it would not be possible to anticipate the impact of the evidence in advance of trial. Id. at 208-09. Therefore, the Court declined to "extend" Bruton to a trial where "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211.

In Marinelli's case, two Defendants, Marinelli and Kirchoff, were jointly tried for the murder of Conrad Dumchock, and neither Defendant testified. The Commonwealth, during its case in chief, introduced Kirchoff and Marinelli's inculpatory statements through the testimony of Trooper Richard Bramhall[11] of the

---

[11] At the end of Kirchoff's statement, and before Trooper Bramhall read Marinelli's statement, the trial Court instructed the jury as follows:

Pennsylvania State Police. When reading each statement, the phrase "the other guy" was substituted for the name of the Defendant. Trooper Bramhall testified that Kirchoff provided the following statement, in relevant part, about the circumstances surrounding the death of Conrad Dumchock:

> As I said, he [Kirchoff] began by explaining what transpired that evening before he actually went to Kulpmont. And Tom said at that point that at sometime between 10:00 and 11:00 p.m. that night, which we talked about, and was clarified to mean that Tuesday evening, April 26, 1994, sometime between 10:00 and 11:00 p.m. that night he said he arrived at the other guy's apartment in Shamokin. And he met there with the other guy and Mark Marinelli. He said that when he arrived there, he said that Mark Marinelli began talking to him and told him of a plan to go and rob a guy in Kulpmont, who he later identified as Conrad Dumchock.

Members of the jury, as a matter of law, a defendant's statement may only be considered by you as evidence against the defendant who gave the statement. Therefore, you must not consider the statement given to Trooper Bramhall by Thomas Kirchoff as evidence against Kevin Marinelli. In the statement testified to by Trooper Bramhall he used the phrase the other guy. In accordance with the rule of law which I have given you the actual name of the other guy was redacted or removed when the statement was testified to by Trooper Bramhall.

Trooper Bramhall will now testify concerning a statement given by Kevin Marinelli. The same rule of law applies. The statement may only be used against Kevin Marinelli and not Thomas Kirchoff. Trooper Bramhall will use the phrase the other guy rather than the actual name given by Kevin Marinelli.

(Doc. 26-5, App. D, Trial NT 5/16/95 at 591-592).

Mark told him that he knew the guy from previously working with him, and he indicated that he believed he had stereo equipment and guns and possibly money that they could steal from the house. So they talked about going there and talked about it for approximately an hour and he thought it was about 11:00 p.m. when they left that apartment in Shamokin.

* * *

He said at - - at that point he described that they - - that all three of them got into a car. He said that he didn't know whose car it was, but described that they all took things with them. He said that he took a flashlight and a baseball bat. He said that Mark Marinelli took a flashlight and - - he took a flashlight and screwdriver. And he said that the other guy took a flashlight and a baseball bat.

We also had some discussion about what the three of them were wearing at that point and throughout that evening. He said that they were wearing - - he couldn't remember the exact clothing that Mark Marinelli and the other guy had on, but he knew they were all wearing black leather, combat style boots; that they all had camouflage military type pants and so forth.

He described, at that point, them getting into this car, he said Mark Marinelli had. And he described Mark Marinelli as being the driver of the car, since he knew where the house was in Kulpmont. And he described the other guy as seated in the right, front seat, and he was in the back seat.

* * *

He said that - - when he talked about after they left the apartment in Shamokin, he said that prior to them leaving, when they were in the apartment talking about going to Dumchock's house, he said that Mark Marinelli knew that Dumchock wasn't going to be there at a particular time that evening. Now, Tom told me he didn't know what time that was, and Mark Marinelli never told him. But he just

explained that for some reason he knew he wouldn't be there at a particular time.

So, as I said, he left - - he said they left at around 11:00 p.m. And as Mark Marinelli was driving the car, he said he was driving slow, like he was intentionally stalling, because he knew of a specific time when they should arrive. And he said that they drove around Shamokin for a little while. They drove around Kulpmont . . .

* * *

Eventually after this driving around, he said that Mark Marinelli decided it was time to do it. And he turned from the Main Street in Kulpmont and drove up the hill, as Tom described it. And he said he drove to a house and pointed it out as Conrad Dumchock's house. And then he parked the car there along the side of the house near the gate that went into the yard into the back porch of the house.

* * *

He said that, at that point, they all three got out of the car, and they all three went up on the porch. He said that Mark tried to open the back door but it was locked.

* * *

He said that once they - - once they found out that none of the doors were open and the windows were all secured, that eventually he said the other guy broke a small window which was on the back door of the house with the baseball bat, broke some of the glass out. And that the other guy reached in and unlocked the door through that broken window.

He said that once the door was open that they all three went into the house. And he said that they all went in in succession, one after the other, through the door . . . And he said that then they all went into a living room on the first floor of the house. And at that time, they saw

54

the stereo equipment that was in an entertainment system, a rack system.

* * *

He said that as he and Mark Marinelli were looking at - - as they all were looking at the entertainment system, he said that the other guy went up those stairs towards the second floor.

* * *

As I said, he said that the other guy left that area and went up the stairway. Soon afterwards Tom described - - he said he heard what he described as a scuffle up the stairs, at the top of the stairs. He said at that point when he heard the scuffle, he said that he began going up the stairs himself.

* * *

He said that when he got near the top of the stairs, to the point that he could see at the top of the stairs, he said that he saw the other guy. And he described it as pounding on a guy with the baseball bat. And he said that that guy, who was being pounded on, was Conrad Dumchock.

* * *

He said that the other guy - - that Dumchock was knocked down. And he could not remember specifically if he was lying on his side or not. But a little bit later on he described how Dumchock's body was lying there. To the point that he said his head was near the opposite side of the door frame that was to the left of the top of the stairs, and that his feet were down towards the top of the stairway. And that is the way he was lying.

* * *

At the point when he described getting near the top of the stairs, and he described the other guy pounding on Conrad Dumchock with the baseball bat, he paused in his account of what had happened. I asked him to go and describe what happened next. And I asked him what did he do. He eventually said he got to the top of the stairs. And he said, 'I went into a frenzy.'

* * *

. . . he said again, 'You know, I lost It, I just lost it.' And then he became more agitated. And he said, I had the baseball bat, and I started hitting him and hitting him. And he was coming off his chair. And he said, I was hitting him and hitting him and I kicked him a few times. And then I settled down and I stopped hitting him, and I realized that I did something very wrong. And the whole time he was moving with his arms as if he was actually hitting someone.

* * *

I asked him if there was any resistance or if Conrad Dumchock fought back at all. And he said, 'No.' I asked him if he remembered anything being said, if Conrad Dumchock was saying anything, or if he was saying anything to Conrad, or to the other guy, or if the other guy was saying anything. He said he couldn't remember any of them saying anything throughout that.

* * *

When the beating was over, he said that the other guy told him to just stay there and watch Conrad Dumchock. And then he went on to explain that that is basically what he did for the remainder of the time that he was in the house . . . He went on to say that the other guy then began going around in some of the other rooms upstairs. And the other guy was carrying things out of the rooms and down the stairs a few times. He really didn't know what those things were . . .

* * *

And eventually when it came time that they all left, the other guy, again, gave him direction.

* * *

He said that - - when they were in the house, he said that he and Mark Marinelli had on bandanas. And he described the other guy as wearing a hockey mask and a baseball hat on backwards.

* * *

I asked him how long all three of them were in the house. And he said that he thought it was about two hours. And I also asked him how long it was from the time they first went in the house until the beating took place. And he said that that was five minutes or less.

* * *

He said that eventually at the end of what he believed was about two hours, he said that the other guy, again, was upstairs, told him to go downstairs, get Mark Marinelli and go out to the car. He said that when he got downstairs, Mark Marinelli was not downstairs. And he said that all the items - - he didn't see any of the items around that he believed that were going to be taken, so he assumed that they were all removed to the car already. So he left the house and went out to the car.

He said that Mark Marinelli was at the car. And just as he got to the car, and he and Mark were standing outside, he said he heard two gunshots. He said he and Mark were scared. They jumped into the car. He said about a minute later the other guy came running out of the house, jumped in the car and said, 'Let's get the hell out of here.' He said that Mark asked the other guy what happened. And the other guy said, 'Don't worry about it, just get out of here.' And they all left. He said at that time, they were in the same places in the vehicle as they were in when they came; Mark Marinelli was driving that he

was in the back seat and the other guy was in the right front. He said, at that time, a lot of the items that were taken were in the back seat with him.

* * *

He said that he specifically remembered that it was 3:30 in the morning when they got back to his house. And he said that once they got back to his house they all went into his basement where he has a little area . . .And when they went inside they took some of the items with them that they took out of Conrad Dumchock's house. He said at that point that they took some guns. They took jugs of whiskey . . . And he said Mark Marinelli had some money.

* * *

He said that a few days later, after that night or that early morning, the other guy came back to his house, his meaning Tom's. And, again, they went in that basement area that he described . . . He said that on that particular date the other guy brought with him a pistol and showed it to Tom. Tom described the pistol. He said he wasn't very familiar with guns, but he described it as a silver colored pistol with wooden grips. He said that it was the same pistol that he had seen the other guy with previously; that the other guy used to carry it around with him most of the time. At that point, the other guy was showing him this pistol. And at that point, the other guy told him that this is the pistol and I shot Conrad Dumchock with it.

* * *

And he said that on the day when the other guy came and showed him the gun, and told him that he shot Conrad Dumchock with that gun, he said that the other guy explained to him that he took a pillow and put it over Conrad Dumchock's head to try to muffle the sound of the shot. But he said that Dumchock was scuffling too much, so he just shot him.

58

(Doc. 26-5, App. D, Trial NT 5/16/95 at 536-561).

Marinelli points to times in the trial when the "redaction" was broken and Petitioner was expressly identified as "the other guy." In his opening statement, Kirchoff's attorney identified Petitioner as "the other guy." The transcript reads, "Kirchoff stated that he was on his way back into the house and trying to talk Kevin out of it, referring to something bad, when he heard the shots." (Doc. 26-2, App. A, Trial NT 5/12/95 at 90). After a sidebar conference, at which Kirchoff's attorney admitted his mistake in which he "said Kevin once", id. at 95, Marinelli's attorney "request[ed] a mistrial and again ask[ed] the Court for severance." Id. The trial court denied the motion for mistrial. Id. at 98.

Additionally, Marinelli argues that, throughout his argument, the prosecutor relied on the statements of Petitioner and Kirchoff without distinguishing which statement could be used against which defendant, see e.g. (doc. 26-7, App. F, Trial NT 5/18/95 at 774, 808-10, 814-16), and then the prosecutor eventually dropped any pretense of "redaction" and expressly identified Petitioner as "the other guy" in Kirchoff's statement.[12] Id. at 815 ("Then the next thing out of Kirchoff's mouth,

---

[12]When the prosecutor also expressly identified Kirchoff as "the other guy" in Petitioner's statement, Kirchoff's counsel objected, (doc. 26-7, App. F, Trial NT 5/18/95 at 817), and the trial court, once again, instructed the jury that:

the statement to McElheny was, he turned and he was going in to try to stop Kevin from doing it."); 815-816 ("So he said he turned to go in and to stop Kevin from doing this bad thing and the next moment two shots rang out ... [and] Kevin comes running out.").

At the end of the trial, the judge instructed the jury that it was not to consider the co-defendants' statements against one another. (Doc. 26-7, App. F, Trial NT 5/18/95 at 851.

The Pennsylvania Supreme Court rejected Petitioner's Bruton claim (presented both as a Confrontation Clause violation and court error for failing to sever the trials), finding that Kirchoff's statements were properly redacted and the evidence against Marinelli was overwhelming, such that any error was harmless.

> In addressing appellant's allegation of error, the appropriate standard is the harmless error test set forth in Commonwealth v. Story, 476 Pa. 39, 383 A.2d 155 (1978). See Bond, supra. An error is harmless "only when in light of the overwhelming evidence of guilt it was so

---

As a matter of law, a defendant's statement can only be considered by you as evidence against the defendant who gave that statement.

Therefore, you should not consider the statement given by Kevin Marinelli to Trooper Bramhall as evidence against Tom Kirchoff. And, likewise, you should not consider the statement given by Thomas Kirchoff to Trooper Bramhall as evidence against Kevin Marinelli.

Id. at 820.

insignificant that it could not have contributed to the verdict." Bond 539 Pa. at 313, 654 A.2d at 314.

Co-defendant's counsel stated in his opening statement:

Kirchoff stated that he was on his way back into the house and trying to talk Kevin out of it, referring to something bad, when he heard the shots.

(N.T. Vol. 1, at 90). There was no prejudice from this reference to appellant by name. All three co-conspirators admitted their involvement in the conspiracy which resulted in the killing. Appellant admitted he pulled the trigger. Moreover, the trial court cautioned the jury that arguments of counsel were not evidence. In light of the overwhelming evidence of appellant's guilt, this reference to his name in co-defendant's opening statement was so insignificant that it could not have contributed to the verdict.

(Doc. 27-4, App. K, Marinelli-1, at 24).

Appellant next asserts that co-defendant Kirchoff's redacted statement implicating appellant remained powerfully incriminating against appellant, thus violating his right to confrontation set forth in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Neither appellant nor his co-defendant testified at their joint trial, but Trooper Bramhall testified as to each of their statements, redacting these statements to refer to the respective co-defendant as the "other guy".

In Bruton, the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial. Subsequent to Bruton, however, we have approved the process of redaction whereby the names of co-defendants are deleted from each of the others' confessions in joint trial situations. Bond, supra; Commonwealth v. Wharton, 530 Pa.

127, 607 A.2d 710 (1992); Commonwealth v. Johnson, 474 Pa. 410, 378 A.2d 859 (1977).

We stated in Bond,

> Admittedly, the redacted confessions along with the other evidence presented may reasonably lead the jury to infer that the "other guy" referred to within the confession of one defendant is obviously the co-defendant. This Court recognizes that where the jury can infer that the redacted confession implicates the defendant, the defendant's rights under the confrontation clause are implicated. However, not all violations of the accused's right to confront his witnesses results in reversible error. The appropriate standard for review under these circumstances is the harmless error test as set forth in Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155 (1978). Commonwealth v. Chestnut, 511 Pa. 169, 512 A.2d 603 (1986) (violation of a defendant's right to confrontation occurring through the admission of a co-defendant's redacted confession is subjected to harmless error analysis.

Id. at 312, 652 A.2d at 314.

The error alleged by appellant here is that redaction had the effect of emphasizing the incriminating statements. We find that in view of the overwhelming evidence against appellant in this matter and the trial court's repeated instructions to the jury that the statements were to be used only against the person who made them, the trial court's admission of these redacted statements, if error at all, was harmless error at best.

(Doc. 27-4, App. K, Marinelli-1, at 30-31).

The Pennsylvania Supreme Court relied on its own prior cases applying Bruton, which permitted use of a confession that redacted reference to the existence of the defendant. Id. (citing Commonwealth v. Johnson, 474 Pa. 410, 378 A.2d 859, 860-61 (Pa.1977) (reference to defendant was deleted including any reference to "we"); Commonwealth v. Chestnut, 512 A.2d 605, 605 (Pa.1986) (rejecting blanket rule prohibiting all "contextual" implication redactions but finding Bruton violation where "jury could not have failed to understand that appellant was "the other person" referred to in the testimony implicating [codefendant]")).

In determining whether the Pennsylvania Supreme Court's decision was contrary to or involved an unreasonable application of Bruton and Marsh to the facts of Marinelli's case, it appears that Kirchoff's statements in Marinelli's case fall somewhere between that deemed constitutionally infirm in Bruton and that deemed acceptable in Marsh. Unlike Bruton, where the co-defendant's statement identified the defendant by name, Marinelli was never identified by name in the statements admitted at trial (although Marinelli was mentioned by name by both Kirchoff's attorney and the prosecutor). However, unlike Marsh, where the co-defendant's statement contained no reference to the existence of a co-conspirator, Kirchoff's statements not only referred to one unnamed, co-conspirator, but laid

63

the blame for the murders directly at the co-conspirator's feet. The essential question in reviewing Marinelli's trial under <u>Bruton</u> and <u>Marsh</u> is whether the statements incriminated Kevin Marinelli powerfully, directly, and on their face, or only inferentially in light of other evidence.

The Commonwealth's consistent theory of the case was that three, individuals, Thomas Kirchoff, Mark Marinelli, and Kevin Marinelli, entered the home of Conrad Dumchock, with the intention of committing a robbery, and exited with the resulting beating, shooting and brutal death of Conrad Dumchock. In his statements, Kirchoff denied committing the murder and accused his co-defendant of committing it on his own. The introduction of Kirchoff's statements, without eliminating reference to the other two co-conspirators, directly implicated Kevin Marinelli. The statements on their face pointed to the only other, unnamed co-conspirator, namely Kevin Marinelli. Without doubt, the statements were powerfully incriminating as to Kevin Marinelli.

The Pennsylvania Supreme Court's analysis of the <u>Bruton</u> issue is limited to noting that "We find that in view of the overwhelming evidence against appellant in this matter and the trial court's repeated instructions to the jury that the statements were to be used only against the person who made them, the trial admission of these redacted statements, if error at all, was harmless error at best."

The Pennsylvania Supreme Court unreasonably applied <u>Bruton</u> by not examining whether the statements directly implicated Marinelli, which they did, despite the substitution of "the other guy" for his name. Thus, the Court concludes that the admission of Kirchoff's statements when he was unavailable for cross-examination violated the Confrontation Clause and the Pennsylvania Supreme Court's determination to the contrary was an unreasonable application of <u>Bruton</u>.

While not directly relevant to determining the state of firmly established Supreme Court law, appellate decisions can nonetheless be helpful and support the conclusion that the Pennsylvania Supreme Court's application of Bruton was unreasonable. Two cases decided by the Third Circuit are particularly instructive. In the most recent, <u>Greene v. Palakovich</u>, 606 F.3d 85 (3d Cir.2010), three or four men robbed a small grocery store and the owner died after being shot. The robbers carried away the cash register and escaped in a vehicle parked nearby. In the investigation, Jackson, a prosecution witness, gave a statement identifying six individuals involved and stating that he and Greene and another individual stayed in the car while the other three committed the robbery. Two co-defendants who did not testify, Finney and Womack, also gave statements. Both implicated Greene in the robbery, and one of them stated that Greene carried out the cash register. Greene did not give any statement. <u>Id</u>. at 88.

At trial, Jackson was a witness for the Commonwealth and testified that Greene entered the store and carried out the cash register, and Greene's counsel cross-examined him based on inconsistencies between his testimony and his statement. The Commonwealth introduced Finney's and Womack's statements, redacted to substitute reference to any of the co-defendants by name with phrases such as "this guy," "other guys," and "two guys," and with neutral pronouns such as "we" or "someone," and in a few instances with simply the word "blank." Id. at 89-90. The Pennsylvania Superior Court upheld Greene's conviction because "all references to the other defendants by proper name or nickname had been removed." Id. at 106.

On habeas review, the Third Circuit concluded that the Superior Court reasonably applied Bruton and Marsh. Id. at 104.[13] The court focused on the fact that there were five or six co-conspirators, in contrast to the two and three defendants involved in Bruton and Marsh. "As a result, Finney's and Womack's redacted statements did not directly implicate Greene." Id. at 106. Additionally, the substitutions used in the redactions-e.g., "other guys"-"yielded confusing

---

[13]As discussed supra at n. 9, Gray was not relevant to the Third Circuit's analysis because it was decided after the Superior Court reviewed Greene's conviction. 606 F.3d at 93-99.

statements that failed to establish either the number of persons involved or ... the role that each person played in committing the offense." Id. For these reasons, the statements did not "expressly implicate[ ] Greene," and the Superior Court reasonably concluded that the jury followed the limiting instruction. Id.

Greene can be contrasted with another recent Third Circuit case, Vazquez v. Wilson, 550 F.3d 270 (3d Cir.2008). There, Vazquez and Santiago were on trial for murder and other offenses. The evidence showed that three men were driving in a car when one of them fired a weapon at another vehicle, killing the victim. A weapon was recovered which contained one fingerprint that was matched to Vazquez and other prints that were too smudged for comparison. Santiago gave a statement in which he reported that he was the driver and that Vazquez and another individual, George Rivera, were the passengers, and that Vazquez was the shooter. Id. at 272-73.

Santiago did not testify at trial, and the prosecution introduced his statement, substituting "my boy" or "the other guy" for the names of Vazquez and Rivera. Santiago's attorney was permitted to tell the jury that Santiago had identified the other individuals by name and had offered to show the police their homes. Vazquez took the stand and testified that Rivera (who was not on trial) was the shooter, and that Rivera passed him the weapon telling him to get rid of it. In

closing argument the prosecutor " 'referred to 'Mr. Santiago's statement that he and the other man George, excuse me, the man who's not the shooter, he said, [had] jumped out of the car.' " The jury acquitted Santiago and convicted Vazquez. Id. at 273-75.

On federal habeas review, the Third Circuit concluded that the state courts had unreasonably applied Bruton when they concluded that Vazquez's confrontation rights were not violated. Id. at 280-81. The court applied Bruton, Marsh, and Gray to reach this conclusion, although its analysis rests less on Gray than on Bruton itself. Its reasoning turns on the role Santiago's statement played in the context of the evidence, and in particular on the fact that Santiago's statement could refer to only two co-conspirators-Vazquez and Rivera-and that therefore the references to "other guy" were not effective in concealing Vazquez's identity.

> [A]s far as admission or use of [Santiago's] statement is concerned, this is and always had been a two-person case involving Vazquez and Rivera....The fact that there were only two possible shooters under Santiago's statement should have made clear to the trial court that, whether or not the jury credited the statement in its entirety, it was almost certain to conclude that the individual Santiago described in his redacted statement as 'my boy' or 'the other guy' as the shooter was Vazquez because Rivera was not on trial and the Commonwealth argued that Vazquez fired the fatal shot.

Id. Indeed, the court found the implication of Vazquez so apparent as to describe it this way: "[I]f this case does not involve 'an unreasonable application ... of clearly

established Federal law, as determined by the Supreme Court of the United States,' it is difficult to conceive of any case that could meet that admittedly exacting standard." Id. at 281.

These cases teach that whereas a statement that refers to multiple conspirators will not necessarily implicate a particular unnamed actor, a statement that refers to the co-defendant himself and one other individual will directly implicate that other individual regardless of the name or label used, particularly when there are only two defendants on trial. Marinelli's case is distinct from Greene. However, it is right on par with Vazquez. While there were three co-conspirators, Thomas Kirchoff, Mark Marinelli and Kevin Marinelli, there were only two defendants on trial for Dumchock's murder. Kirchoff referenced himself, the other co-conspirator, Mark Marinelli, and "the other guy" in his statements. As the case was presented, there was no possibility that "the other guy" in those statements referred to anyone other than Kevin Marinelli. It was an inescapable conclusion easily drawn by anyone listening to the evidence. Thus, despite the redactions, Kirchoff's statements directly implicated Kevin Marinelli.

The Third Circuit queried in Vazquez "if this case does not involve 'an unreasonable application ... of clearly established Federal law ...' it is difficult to conceive of any case that could meet that admittedly exacting standard." 550 F.3d

at 281. So, too, with the present case. Kirchoff's statements, laying blame for the murder at the hands of "the other guy," when three people were involved in the crimes, only two of whom were on trial, and only one person's name was redacted from the statements, and that person happens to be sitting beside him at the defense table, "posed a substantial threat to petitioner's right to confront the witnesses against him." Bruton, 391 U.S. at 137.

It also bears mentioning that Kirchoff's attorney's use of Kevin Marinelli in his opening statements, as well as, the prosecutor's use of Kevin Marinelli's name during closing argument compounded the Bruton violation. Specifically damaging was the prosecutor's reference to Kirchoff's statement that "he turned to go in and to stop Kevin from doing this bad thing and the next moment two shots rang out ... [and] Kevin comes running out.").

When viewed in the context of the testimony presented at trial, these reliances on Kirchoff's statements to prove Marinelli's guilt amount to a direct attack on the Bruton rule. In Vazquez, the Third Circuit concluded that the prosecutor's misstatement, inserting the name of Vazquez's codefendant as the non-shooter, "effectively eliminated the redaction of Vazquez's name." Vazquez, 550 F.3d at 275. Here, the statements in the prosecutor's closing had the same

effect of eliminating the redaction and inserting Kevin Marinelli's name back into Kirchoff's statements.

Finding a <u>Bruton</u> violation, however, does not end the inquiry. Before granting habeas relief, the court must determine if the constitutional violation had a "substantial and injurious effect" on the fairness of the trial. <u>Fry v. Pliler</u>, 551 U.S. 112, 121, 127 (2007) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). This requires the petitioner to establish that the constitutional error resulted in actual prejudice. <u>Brecht</u>, 507 U.S. at 637 (citing <u>United States v. Lane</u>, 474 U.S. 438, 449 (1986)). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." <u>See</u> <u>Bond v. Beard</u>, 539 F.3d 256, 276 (3d Cir.2008) (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)). The harmless error analysis is performed de novo by the federal courts. <u>Id</u>. at 275-76 ( "<u>Fry</u> instructs us to perform our own harmless error analysis under <u>Brecht</u> ..., rather than review the state court's harmless error analysis under the AEDPA standard.").

The Pennsylvania Supreme Court determined that the Commonwealth presented "overwhelming evidence" of Marinelli's guilt, such that even if Marinelli was implicated by context, the result was harmless error. Although the

federal courts do not owe deference to the Court's harmless error conclusion, this Court agrees that the evidence against Marinelli was strong enough, even apart from the evidence admitted in violation of Bruton, that the error did not cause actual prejudice.

In addition to the testimony of Marinelli's brother, Mark, who implicated Marinelli in the murder, witness Nathan Reigle, who testified that Kevin Marinelli had bragged about how he had killed Dumchock, and the physical evidence recovered after a search of Marinelli's residence, Kevin Marinelli's statement, in which he admits that he intentionally shot Conrad Dumchock, was presented by the Commonwealth at trial. At trial, Trooper Bramhall recounted Marinelli's statement to police:

> He [MarinellI] said that that night . . . his brother, Mark, came up with an idea of going to a house in Kulpmont and stealing some things . . . this was a house that belonged to Conrad Dumchock. . . And he also said that Mark told him that he believed - - he knew that Conrad used to be in a band and that he had a lot of stereo equipment, expensive stereo equipment and that he believed that they could go there and steal that, and he also thought that he had guns.

> * * *

> He said that after Mark described all this to him, and the two of them talking about this, he decided that he would like to go and steal these items with his brother, Mark. At some point then, his brother, Mark said that probably they need somebody to go with them to help them

get some of the items out of the house. And Kevin said that he told Mark he knew of another guy who would probably help.

* * *

He said that once the other guy arrived, which was around 10:00 p.m., he said that then he and his brother, Mark, sat around with this other guy and explained the plan to him about going to Conrad Dumchock's and stealing these things. And that after they explained it to him, the other guy eventually decided that he would go and help them.

* * *

. . . And when he talked about what they all took with them, he said that they all took flashlights, each of them had a flashlight that they took with them. He said that he had a .25 caliber pistol which he later said was a Raven brand. It was a pistol he said that he carried around with him for protection. . .

* * *

. . . He said that his brother, Mark, took a baseball bat. And he explained that that baseball bat was already in the car when they got in the car, that Mark usually kept it in the car, and it was already there. And he described that all three of them got in the car.

He said that Mark drove; his brother, Mark, drove. He was in the front of the car and the other guy was in the back seat . . .

* * *

. . . He said, again, they all three went upon the porch. And at that point he said they talked about breaking out the little window in the back door. And he mentioned that he was concerned that it might make too much noise. And his brother, Mark, told him to put his jacket, that he had on, up against the window and use his elbow to break it out, which he said he did. He said just a little piece of glass

73

broke out and he picked sought [sic] some other pieces from the window which he laid down carefully so not to make too much noise. And then he reached inside and unlocked the door and opened it up.

* * *

He said that when they entered the house through that back door, he said the first room that they were in was the kitchen . . .

* * *

He said that once they passed through the kitchen and the next room they entered the living room in the first floor there of the house. He said once they got in the living room they saw the - - all the stereo equipment in an entertainment system, in a rack system. He said that they all went over to where that was located and they started checking it out. He said they started looking it over.

* * *

. . . He said as they were standing there looking at the stereo equipment, his brother, Mark, told him no, and said he motioned with his hand or his finger, pointed to the stairs and up the stairs. He said no, go upstairs, that his brother, Mark, told him that. He said at that point he assumed that Mark meant to go upstairs because there was good stuff up there to steal.

* * *

. . . he said when he got to the top of the stairs, off to his right, he said that he heard a dog growling . . .

* * *

At any rate, he walked across the hall into the bathroom. He said when he got inside the bathroom, the door which he described as opening into the bathroom, he said he got behind the door and he held

onto the door knob and pulled the door closed against him, so that he was between the door and the wall . . .

He said that right after he felt that tug against the door he said that a person looked around the end of the door and looked at him. And he said that person was Conrad Dumchock.

* * *

. . . He said at that point Conrad said to him, What the hell are you doing here. And Kevin described that he didn't really say anything. And Conrad said, Well, I guess you better leave. And Kevin said, he said in response, Yeah, I guess I better. So at that point, he said the door was open. He stepped out from behind it. He said that Conrad then stepped out of the way slightly so that Kevin could pass him. And Kevin said he walked out of the bathroom past Conrad and walked towards the top of the stairs.

* * *

He said that just as he got to the top of the stairs, he looked down towards the bottom of the stairway. And he said right at the bottom of the stairway with - - and he specifically said, again, about his brother, Mark, with the Do Rag over his face, he said his brother, Mark, was standing at the bottom of the stairway looking up at him and shaking his head no.

* * *

Kevin, again, said that when he saw Mark do that he said he knew what Mark meant. And he explained that he knew Mark meant that they weren't going to leave without taking some stuff. So, he said at that point he said he reached into his pocket, the pocket of his jacked that he had on, and he took the .256 caliber pistol that he had - - he said he got that out of his pocket and turned and held the gun up between himself and Conrad. And I asked him if he pointed it at Conrad at that point. And he said, no, he held it up between the two of them so that Conrad could see it . . .

75

* * *

He said that he held the gun up, and he believed Conrad recognized it as a gun. He said that Conrad - - again, he described that he looked scared. And he said that Conrad made a comment to the effect of, you can have whatever you want, or take whatever you want.

* * *

... And he said that after he got the gun out and held it up between himself and Conrad, he said that his brother, Mark, then came from the bottom of the stairs, came up the stairs and go to the top and stood - -what he described as slightly behind him and off to his left. He said, against, that his brother still had the baseball bat.

* * *

... At any rate, while his brother, Mark had gotten up to the top of the stairs, and was standing somewhat behind him, he said then he saw the other guy start to come up the stairs quickly. He said the other guy had the ax handle in his hand, and he was quickly coming up the stairs. At that point, Kevin said he believed, because of the way the other guy was coming up the stairs and how that was happening, he believed that the other guy was going to hit Conrad with the ax handle.

* * *

He said that since he thought that the other guy was going to hit Conrad with the ax handle, that if he hit him first, that the other guy wouldn't hit him. So he said that he took the gun and hit Conrad in the face with it.

* * *

He said that just after he hit Conrad in the face with the gun, he said the other guy now had gotten to the top of the stairs. And he said the

76

other guy hit Conrad in the legs, he said around the area of the knees with the ax handle that he had. He said once the other guy hit Conrad in the legs with the ax handle, he said then Conrad fell down. And he described him falling on to his right side. He said at that point - - Kevin said at that point Conrad made a comment about, 'Please don't hurt me,' after he got hit and fell down. And Kevin said that he told the other guy something along the lines of, you know, 'don't hit him anymore, don't hit him again.'

* * *

. . . But anyway, the other guy, he said, just started hitting him with the ax handle. He said he hit him a lot of time and he hit him all over.

* * *

. . . he said that Conrad wasn't fighting back. He said he didn't even try to get up. He said he thinks he was trying to cover up with his hands, maybe to protect himself, but he wasn't fighting back or trying to get up at all. And he said that the other guy was hitting him with the ax handle, kept hitting him and hitting him. And Kevin said he told the other guy to stop, to stop hitting him. And he said at first it seemed like the other guy didn't hear him, because the other guy didn't stop.

* * *

. . . And then he said he reached out and grabbed him [the other guy] either his shoulder or somewhere in that area, he grabbed him and kind of yanked him. And he said then the guy finally stopped hitting him. And he said, at that point, he told the other guy, you know, again, he said, he told him, 'Don't hit him anymore.' And he told the other guy, 'Just stay here and watch him.'

* * *

. . . we talked about how Conrad was lying at that point and what was happening and so on. He said, again, that Conrad was lying on his

right side. And he described his head as being up near the opposite side of a door frame, so that he looking into another bedroom, so that Conrad was facing another bedroom. And he described his body as being somewhat curved, and that his feet were down by the top of the stairs . . .

\* \* \*

. . . once the beating had stopped, then he said Mark was still at the top of the stairs, and Mark told him that he was going to go downstairs and get the stereo equipment and start loading it onto the kitchen table, or taking it into the car, loading it into the car. And he said Mark did go downstairs.

\* \* \*

He said that at that point after Mark went downstairs, saying he was going to get the stereo equipment, Kevin said that he then went from the area on the hallway there into the bedroom at the right - - to the right of the top of the stairs . . .

\* \* \*

He said that once he turned the closet light on, he looked around in the closet. In the corner of the closet he founds some guns . . . He took them out of the closet and he laid them on the bed, he said.

Then he said he went to a filing cabinet that was long the wall next to the bed somewhere. And he opened up the drawers of the filing cabinets, and inside there he found - - he said he found about eight boxes of .22 shells or ammunition, and he found some 12 gauge shotgun shells. I think he said about three or four, just a few. And he also found - - he said he found a revolver. At that point he said he didn't know exactly what kind it was, but he found a revolver, a handgun. And he laid all of that on the bed also.

Later on, as we were talking about that, this whole scenario against, he described that he also, in that drawer, found a stack of Two Dollars bills, and he laid them on the bed also.

* * *

He said that after he laid the guns and the ammunition on the bed, he said he wanted his brother, Mark, to look at them. So he said that he yelled for his brother Mark, to come up the stairs to look at that stuff. And he talked about that. And he said the first time he wasn't sure if Mark heard him. So he went outside the bedroom, and he was going to yell for Mark again to come up the stairs. And he described now that when he comes out of the bedroom - -

* * *

He said that when he came out of the bedroom into the hallway, now he sees the other guy - - he sees Conrad laying in the same place, but now he says he sees the other guy with the ax handle. He says that the other guy has the ax handle around the neck of Conrad Dumchock, underneath his neck, and that he has got both of his hands on the ax handle. And he describes him as having his knee on his back and him pulling up on the ax handle, like he believed he was trying to choke him. He believed that he was trying to choke him.

* * *

He claimed, again, that he went up to the guy and yelled at him and told him, 'Get off of him, you're going to kill him,' something to that effect. He said, again, he reached out and he had to grab the guy's shoulder, or something to that effect, and pull the guy . . .

* * *

. . . And he described at that point that he described Conrad as being - - he said there was a lot more blood. He said he thought that Conrad must have been hit more times while he was in the bedroom because

he said that compared to the first time he saw him, now there was more blood on the -- he described it on the door frame and around Conrad's head, and on his head, and so on and on, the floor. And he figured that he must have been beaten more.

* * *

. . . he [Marinelli] talks about going back into the bedroom from which he had come, from where he found the guns. And he talked about grabbing pillows. And we talked about that. He said that he grabbed two pillows out of that bedroom. He brought them back out into the hallway.

* * *

Well, Kevin claims that he put one pillow behind Conrad's head, between his head and the door frame. And he claims that he put the other pillow underneath Conrad's head . . . And he said then he remembered his [Conrad's] hands falling away from his face, just limp. He said Conrad's eyes were closed. He saw that at that point. And he said he assumed or he figured that Conrad was knocked out, is what he said.

* * *

. . . he said he was concerned for Conrad that - - he said he was concerned about his welfare; basically that, you know, he was bleeding so much and he was concerned about that bleeding . . . he talks about having medic training or whatever. And he talks about maybe that kicked in, and he had some kind of concern for the injuries that Conrad had. And that was the explanation he gave for the pillows.

* * *

He said when Mark got to the top of the stairs, he motioned him to the bedroom . . . And he said Mark began looking at the guns then. And he said at that point Mark looked at the revolver, the handgun he had

found . . . And he said Mark told him it was a .22 revolver . . . Mark told Kevin to take the rifles and the shotgun and take them downstairs.

\* \* \*

He said he took the guns downstairs . . . He talks about going through that room into a bathroom at the back of the house. And he talks about ripping a phone cord from a phone that was in that bathroom.

\* \* \*

Kevin said, at that point, again, he went back up the stairs . . . He said at that point, his brother, Mark, took some of the ammunition that he had found, that Kevin had found, the .22 ammunition, he said he took that, and he saw his brother, Mark load that into the .22 revolver. And he mentioned about having - - he thought it was seven shots. But anyway, his brother, Mark, loaded, he thought seven shots into that gun.

\* \* \*

. . . And then he said eventually his brother, Mark, made a comment to him, said to him, 'You know what you're going to have to do now, you're going to have to kill him,' meaning - - referring to Conrad.

\* \* \*

Kevin said that he made a comment in return to his brother, Mark, that 'I don't want to shoot nobody or I don't want to kill nobody.' And his brother, Mark, again, said that, you know, 'You're going to have to shoot him - - you're going to have to kill him, because he saw your face'. . .

\* \* \*

. . . he said his brother, Mark, reached into the side pocket and pulled out the .22 revolver that he had had in there from the other bedroom.

81

He said that his brother, Mark, took that revolver and pointed it at him. He said different things at this point. He said that at one point he stuck it in his stomach. He said he pointed it at him. At any rate, the bottom line is that he claimed from a very short distance away his brother Mark had the gun and pointed it at him

* * *

He said that his brother, Mark, made a comment to him about, 'Well, if you don't shoot him, I'm going to shoot you'. And he claimed that - - first, he said by the look on Mark's face . . . he talks about the look in Mark's eyes.

* * *

. . . And he talked about, you know, he took out the gun that he had, the .25 caliber pistol, when he turned and walked up to Conrad. And he said that Mark, his brother, still had the gun out pointed at him while he turned around and walked closer to Conrad. And as he showed us how things were situated and where he was standing and so forth, the distance that he described was approximately five feet, is where he claimed that he actually shot Conrad Dumchock from . . .

He said he pointed it right at Conrad's head. And he said he pulled the trigger twice. He basically described it as being twice, one right after the other, right in a row, and in rapid succession.

* * *

. . . He said they went downstairs, went through the living room back into the kitchen. He said that when they go to the kitchen they noticed all the stuff, stereo equipment and whatever, was off the kitchen table. He noticed that. He said they went outside, right to the car. He said when they got to the car the other guy was already inside the car.

* * *

. . . he talked about his brother, Mark, driving slow from Dumchock's house in Kulpmont back to the other guy's house, just outside Shamokin. When they got there to the other guy's house, he said that they took some of the items that they had stolen from Conrad Dumchock's house, they took them out of the car and took them into the other guy's basement.

* * *

. . he said before they left, he said that the other guy started complaining about the things that they were leaving at his house, and he thought he wasn't getting a fair deal in what they left him, so - - and they talked about specifically money, so he was complaining about that. So Kevin said to satisfy the other guy or to keep him quiet and keep him from complaining, he said that he gave the other guy his pistol that he had, that .25 caliber pistol.

* * *

. . . he says that Mark mentions to him that he wants to go back to Conrad Dumchock's house and steal motorcycles that were at Dumchock's house.

* * *

. . . he said they drove to Conrad Dumchock's house. He said they drove around again to check things out and make sure that no one was out looking or nothing was unusual or whatever . . .

* * *

. . he said his brother, Mark, left him off, dropped him off, left him out of the car and told him to go up and get the motorcycles off the porch where they were . . . Mark told him just to get one of the motorcycles, and he told him to get the better one, which he says was the Yamaha YZ, which he then talked about him having a motorcycle at one point

like that. And so he said he took that motorcycle down off of the porch and through the gate and the fence.

\* \* \*

And he talked about at one point when he got to the end of the first block that he laid it down because he said he was trying to fool with the gas switch to make sure that the gas was on. And then he said he got to the end of the second block and he still couldn't get the motorcycle started . . .And he said again, his brother, Mark was following him in the car. He said he got on the motorcycle and he was drifting it down the hill. And he said now he was trying to jump start it. And he said he was trying to start it by compression . . .

\* \* \*

He said he kept on going all the way until he got to the bottom of that street, to where he couldn't go any further at the bottom of Kulpmont. And then he described that he still couldn't get the motorcycle started so he just decided to ditch it.

(Doc. 26-6, App. E, Trial NT 5/17/95 at 593-651).

Marinelli argues that inclusion of Kirchoff's statement was more than harmless error, because the differences between Kirchoff's statement and his statement went to the heart of the case against Petitioner at both phases of trial.

At guilt-phase, the Commonwealth introduced Petitioner's statements to the police, in which he admitted shooting Dumchock. However, Petitioner also stated that Dumchock was brutally beaten by Kirchoff before the shooting; that Petitioner did not know if Dumchock was still alive when he was shot; that Petitioner shot Dumchock under the duress of death-threats from his brother; and that, to escape

his brother's threats, he shot quickly and from several feet away. Petitioner's possible guilt-phase defenses, therefore, were that he lacked a specific intent to kill (an element of first degree murder); that he was under duress, see 18 Pa.C.S. § 309; and/or that the gunshot wounds were not the cause of death (an element of any degree of murder) and that, instead, the death was caused by Kirchoff's beating. Petitioner claims that these defenses were consistent with his statement, but inconsistent with Kirchoff's.

Petitioner claims that at penalty-phase, the conflicts between his and Kirchoff's statements were critical to both aggravating circumstances – the "offense was committed by means of torture," 42 Pa.C.S. § 9711(d)(8), and the "defendant committed a killing while in the perpetration of a felony," § 9711(d)(6). The statements differed on who committed the beating and, thus, *who* "committed ... torture." Thus, Petitioner concludes that the statements gave rise to different inferences about whose actions were the cause of death and, thus, *who* "committed a killing while in the perpetration of a felony." See Commonwealth v. Lassister, 722 A.2d 657, 661 (Pa. 1998) (the (d)(6) aggravating circumstance applies only to the defendant who "performed the murder herself in the sense of bringing it to completion of finishing it"). Petitioner argues that the statements also conflicted on the issue of duress/domination, a statutory mitigating factor in Pennsylvania.

See 42 Pa.C.S. § 9711(e)(5) ("defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution [at the guilt-phase], or acted under the substantial domination of another person").

Once again, the Court finds that Marinelli falls short of establishing that the error had a substantial and injurious effect or influence on the verdict. Although Marinelli undoubtedly disagreed with some portions of Kirchoff's account and did not want the jury to hear Kirchoff's statement at all, this does not mean that the admission of such statements, in light of all the overwhelming evidence, had a substantial and injurious effect on the verdict. See e.g. Cruz v. New York, 481 U.S. 186, 192-93 (1987) (recognizing that a corroborating co-conspirator confession can be more damaging than a contradictory co-conspirator confession).

To the extent that some doubt remains as to whether the jury would have convicted Marinelli, without hearing Kirchoff's statements, in light of the Commonwealth's evidence apart from Kirchoff's statements, this Court cannot say that such doubt is "grave." Rather, on the basis of the entire trial transcript, the Court concludes that Marinelli has failed to show that the Bruton violation had a "substantial and injurious effect" on the fairness of his trial. See, e.g., Bond, 539 F.3d at 276 (Bruton error harmless on habeas review where eyewitness identified defendant, another witness gave statement identifying defendant as

86

shooter which she recanted at trial, and defendant admitted the shooting but argued confession was coerced); Sanders v. Klem, 341 Fed. Appx. 839, 843 (3d Cir. 2009) (Bruton error harmless on habeas review where defendant's own statements and medical examiner's testimony that shooting was at close range established that shooting occurred during robbery rather than during flight); Robinson v Shannon, Civ. No. 08-1074, 2009 WL 2474632, at *6 (E.D. Pa. Aug.11, 2009) (Bruton error harmless on habeas review where defendant confessed and a witness described defendant's role in plan); see also United States v. Hardwick, 544 F.3d 565, 574 (3d Cir.2008) ( Bruton error harmless beyond a reasonable doubt on direct appeal where several witnesses including co-conspirators testified to defendants' participation in murders, another witness described escalating dispute between defendant and one of victims, and shell casings from one murder scene matched those at another murder scene); United States v. Ruff, 717 F.2d 855, 858 (3d Cir.1983) ( Bruton error harmless on direct review where defendant admitted crimes to witness, did not deny crimes when co-defendant admitted them to another witness, and defendant drove victim's car and had her personal effects; cf. Vazquez, 550 F.3d at 282-83 ( Bruton error not harmless on habeas review where defendant did not confess to shooting victim and no witness testified that he fired a weapon); Holland v. Attorney General of New

Jersey, 777 F.2d 150, 157-59 (3d Cir.1985) ( Bruton error not harmless on habeas review where defendant did not admit crime and no eyewitness placed defendant at scene at the time of crime).

This Court finds that the state court unreasonably applied settled Supreme Court law in concluding that the trial court's admission of Kirchoff's statements did not violate Bruton. Nevertheless, in light of the other evidence admitted at trial, this Court concludes that the error was harmless. For these reasons, Marinelli's petition will be denied as to Claim I.

**Claim II**

**Petitioner's convictions and death sentence should be vacated because his due process rights were violated under Brady v. Maryland, and its progeny.**

Petitioner contends that the prosecution violated Brady by withholding: (1) mitigating information regarding Petitioner's traumatic life history; (2) exculpatory/mitigating information regarding Petitioner's intoxication at the time of the offense; (3) impeachment information regarding Commonwealth witness Mark Marinelli; and (4) impeachment information regarding Commonwealth witness Nathan Reigle. (Doc. 18, Memorandum of Law at p. 23-29).

As the Court of Appeals has recently reaffirmed, "[a] Brady violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory

or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.' " Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir.2011) (internal citations omitted). The requirement that the prosecution disclose such information extends not only to information that is actually known to the prosecutors, but also to "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Wilson v. Beard, 589 F.3d 651, 659 (3d Cir.2009) (citing Youngblood v. West Virginia, 547 U.S. 867, 869–70 (2006)); see also Kyles v. Whitley, 514 U.S. 419, 437–38 (1995). Willful or morally culpable suppression of Brady evidence is not necessary for relief to be granted. The Supreme Court has long recognized that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." United States v. Agurs, 427 U.S. 97, 110 (1976). Even a criminal defendant's failure to request favorable evidence does not abrogate the prosecution's disclosure obligations. Kyles, 514 U.S. at 432–33. "[A] defendant's failure to request favorable evidence [does] not leave the Government free of all obligation[,]" and a Brady violation might arise even "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." Id. at 433 (citing Agurs, 427 U.S. at 108).

89

"Impeachment evidence ... as well as exculpatory evidence, falls within the Brady rule.[14]" United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)). "Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. (quoting Brady, 373 U.S. at 87; citing Napue v. Illinois, 360 U.S. 264, 269 (1959)) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend"). "Brady ... envisions two requirements for overturning a verdict: (1) that evidence in the possession of the government was actually suppressed, and (2) that the suppressed evidence was material." Slutzker, 393 F.3d at 386.

The "materiality" of suppressed evidence must be determined collectively, and not item-by-item. Kyles, 514 U.S. at 436. Additionally, the "materiality" test under Brady does not require a petitioner to show that "after discounting the

---

[14]The Supreme Court has explicitly held that impeachment evidence need not also be exculpatory in order to be favorable, and thus discoverable, under Brady. Strickler v. Greene, 527 U.S. 263, 282 n. 21 (1999).

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434–35. Instead, evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435(footnote omitted). Indeed, a Brady violation may occur even if the record contains adequate evidence to convict after the disclosure of favorable evidence. Id. at 435 n. 8. " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " Beard, 633 F.3d at 133 (quoting Kyles, 514 U.S. at 434). " '[C]onfidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction.' " Beard, 633 F.3d at 134 n. 3 (quoting Norton v. Spencer, 351 F.3d 1, 9 (1st Cir.2003)).

The prosecution's obligation to disclose Brady materials applies even to evidence that appears redundant. "Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations." Monroe v. Angelone, 323 F.3d 286, 301 (4th Cir.2003). Finally, the determination of materiality of evidence under Brady is a mixed question of law and fact that is not

subject to the presumption of correctness of § 2254(e)(1). <u>Simmons v. Beard</u>, 590 F.3d 223, 233 n. 5 (3d Cir.2009) (internal quotes and citations omitted).

**1.    Mitigating Information Regarding Petitioner's Life History.**

Petitioner claims that the prosecutor knew, but did not disclose to the defense, that Petitioner's step-mother, Charlotte Marinelli, was severely mentally ill, frightening, violent and dangerous, and committed suicide in prison. (Doc. 18, Memorandum of Law at 23).

Specifically, Petitioner states that the trial prosecutor, Robert B. Sacavage, who was the District Attorney of Northumberland County from 1983 through the time of Petitioner's trial[15], gave information, in September 1988, when Petitioner was 16 years old, to mental health authorities, which resulted in Charlotte Marinelli's involuntary mental hospitalization. <u>Id</u>. at 24. Allegedly, he informed authorities that Charlotte was "a clear and present danger to herself and others" because she was "setting fires and adulterating a neighbor's food and/or drink" with drugs. <u>Id</u>. Also in September, 1988, it is alleged that District Attorney Sacavage wrote a letter to Geisinger Medical Center, describing some of his knowledge of Charlotte's mental illness and violent acts, and again urging that she

---

[15]Attorney Sacavage is now a judge in the Northumberland County Court of Common Pleas.

be involuntarily committed. Id. Petitioner claims that District Attorney Sacavage wrote, *inter alia,* that Charlotte was a "former mental patient"; that he believed she had committed numerous arsons and attempted arsons, including of her own home; that he believed she had tried to poison neighbors by putting drugs in their drinks and food; that police officers who observed her saw that her "behavior was 'bizarre'"; that people who lived near her were afraid of her because of her bizarre and dangerous behavior; that she was the subject of ongoing investigation, which he expected to result in criminal charges against her; that she posed a "clear and present danger to herself and to the people in the neighborhood,"and that failure to commit her could cause "a catastrophe." Id.

Moreover, Petitioner alleges that in March 1989, District Attorney Sacavage charged Charlotte Marinelli with arson, risking a catastrophe, reckless endangering and criminal mischief. She was arrested and imprisoned in the Northumberland County Prison, where she committed suicide, by hanging herself with a bedsheet, just a few hours later. Id.

Thus, Petitioner argues that "had this information about Petitioner's traumatic background been provided to trial counsel, 'any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses' at penalty phase, would have further

investigated Petitioner's background, and would have developed the significant

mitigating evidence that was available here." Id. at 26.

The Pennsylvania Supreme Court addressed Petitioner's claim as follows:

Next, Marinelli submits that the Commonwealth failed to provide him with mitigating information concerning his own upbringing. Specifically, Marinelli asserts that Robert Sacavage (now Judge Sacavage), the prosecutor assigned to his case, was aware that Marinelli had a "horrific" childhood because the prosecutor had had dealings with Marinelli's stepmother, Charlotte Marinelli (Charlotte), seven years before Marinelli's trial, and had then attempted to get Charlotte committed. Marinelli alleges that Judge Sacavage intentionally misled the jury about the childhood of Marinelli.

When questioned by counsel for Marinelli at the PCRA hearing, Judge Sacavage testified as follows:

Q:    Okay. When you made that argument to the jury that was sitting over here, and you told them that, "Mr. Marinelli had a rough childhood, that he came from a broken home, the Commonwealth submits to you that on the last point there are millions of Americans that come from broken homes these days, and it doesn't necessarily equate to someone committing a very serious crime." Judge, when you made that argument you were aware that Mr. Marinelli not only came from a broken home, he came from a home where there was a psychotic individual that was attempting to kill people; were you not?

A:    When did he live in this-I don't-it is difficult to answer that. Are you referring to Charlotte Marinelli? . . . Charlotte Marinelli was a stepmother of Mr. Marinelli . . . I have no idea

94

when Mr. Marinelli resided in that household. In fact, I don't recall Kevin Marinelli residing in that household at the time that we were involved with Charlotte Marinelli . . . At the time we were involved with Charlotte Marinelli, there were no matters pertaining to Kevin Marinelli. That was -- there was no real reference to that at all. We were investigating an arson case in Atlas.

Q:     Okay. And let me just sharpen this so perhaps I can make the relevance clear. You make an argument in front of a jury that my client merely comes from a broken home. When you made that argument, you knew that it is not merely a broken home, it is a home where there is a step mom that is attempting to burn down houses, poison her husband, poison other neighbors and attempting to kill her husband. You knew these things; didn't you?

A:     You are entirely wrong, I believe. And I would say that you are wrong because Kevin Marinelli probably was grown by that time. I think Kevin's mother lived in Shamokin. Joseph and Charlotte lived in Atlas. I don't see your connection there . . . And with regard to those words that I spoke, trying to equate that with Charlotte Marinelli, you are totally off base. The comment there was simply that if Joseph Marinelli would have been married and then remarried, it is a broken home. I mean, and it says what it says. There are millions of Americans that come from broken homes, and they don't end up killing people.

Q:     So that if you are in possession of information in your files, in your records, which goes to sentencing, which is mitigating in sentencing, you

are telling me that I'm the one that is off base if you don't disclose that? Is that what you're telling me?

A: I'm telling you I don't know what relationship Kevin Marinelli had with Charlotte Marinelli, if any. And if there is something in some report in this whole case that references that, show it to me. [Whereupon PCRA counsel for Marinelli showed Sacavage the letter dated September 9, 1988.][16]

\* \* \*

Q: So that I'm clear, Judge Sacavage, at the time that you tried the penalty phase in Mr. Kevin Marinelli's case you thought that Charlotte Marinelli had absolutely no connection with the man you were trying, who had the same last name; do I have that right?

A: What I thought and what information I had are two different things. One, I didn't think it because I had no information to connect Charlotte with Kevin, except that Charlotte was the second wife of Joseph Marinelli.

(PCRA N.T., 1/24/00-1/27/00, at 370-373, 380). This testimony reflects that Judge Sacavage was not aware that Charlotte and Marinelli resided together, nor did he connect his September 1988 dealings with Charlotte in any way to Marinelli.[17] We do not find it

---

[16]The letter to which Marinelli refers was sent by Judge Sacavage to Geisinger Medical Center in September of 1998, asking that facility to reconsider its decision not to commit Charlotte.

[17]As the Commonwealth notes, "[n]owhere in the letter is it mentioned about the marital state of Charlotte Marinelli, to whom she was married and with whom she was residing." (Brief of Commonwealth, at 36).

unreasonable that Judge Sacavage failed to turn over this letter that he
had no way of connecting to the case against Marinelli. Moreover,
Marinelli has not met his burden of proving a <u>Brady</u> violation
pursuant to the test set forth in <u>Agurs</u> and <u>Moose</u>, which requires one
claiming a <u>Brady</u> violation following a general request for exculpatory
information to show that "the omitted evidence creates a reasonable
doubt that did not otherwise exist." <u>Moose</u>, 602 A.2d at 1272 (quoting
<u>Agurs</u>, 427 U.S. at 112, 96 S.Ct. 2392). The PCRA court properly
rejected this allegation of error.

(Doc. 27-9, App. R, <u>Marinelli-2</u> at 21-24).

Marinelli argues that when evaluating this claim, the Pennsylvania Supreme
Court applied the <u>Agurs</u> materiality standard, a standard which he argues is
contrary to the clearly established United States Supreme Court law in <u>Kyles</u> and
<u>Bagley</u>, <u>supra</u>.

In <u>United States v. Agurs</u>, 427 U.S. 97 (1976), the Supreme court described
three (3) different situations of prosecutorial nondisclosure and framed a different
standard for determining materiality in each situation. <u>Id</u>. The first is an instance
involving "a corruption of the truth-seeking function of the trial process," by
prosecutorial misconduct as when the prosecution's case includes perjured
testimony and the prosecution knew, or should have known, of the perjury. <u>Agurs</u>,
427 U.S. at 106. Recognizing that a conviction obtained by the knowing use of
perjury is fundamentally unfair, the court stated such a verdict must be set aside "if

there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. This was described as a "strict standard of materiality." Id.

The second situation arises when the defendant has made a specific request for information and the prosecution has failed or refused to respond to the request, as occurred in Brady. Non-response by the prosecutor in such a case, the Court found, "is seldom, if ever, excusable." Agurs, 427 U.S. at 106. Evidence will be deemed material if the suppressed evidence might have affected the outcome of the trial." Agurs, 427 U.S. at 106.

Thirdly, when no request is made by defendant or only a general request is made, information not revealed by the prosecutor will be held to be material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." Agurs, U.S. 427 at 112.

In United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court disavowed any difference between exculpatory and impeachment evidence for Brady purposes, and it abandoned the distinction between the second and third Agurs circumstances, i.e., the "specific-request" and "general- or no-request" situations. Kyles, 514 U.S. at 433-34 (quoting Bagley, 473 U.S. at 682). Bagley held that regardless of request, favorable evidence is material, and constitutional

error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id.

However, even when viewed against the backdrop of Kyles and Bagley, this Court finds the Supreme Court's decision reasonable.

First, in keeping with the mandates of Brady, the Supreme Court determined that the evidence at issue, namely the information the District Attorney possessed concerning Kevin Marinelli's stepmother, Charlotte Marinelli's mental health, was not exculpatory, in that it, in no way, connected Kevin Marinelli with Charlotte Marinelli. However, regardless of whether, or not, the prosecutor perceived a connection between Charlotte and Kevin Marinelli, the Court questions whether such information is Brady evidence at all. The facts pertaining to Charlotte Marinelli were known by or readily available to the Petitioner long before trial. It is well-settled that the government does not violate Brady by failing to disclose exculpatory or impeaching evidence that is available to the defense from other sources in the exercise of due diligence. See, e.g., United States v. Hicks, 848 F.2d 1, 4 (1st Cir.1988) (no Brady violation for failure to disclose grand jury testimony of potential witness not called to testify at trial because defense knew of and had access to witness and thus was "on notice of the essential facts required to enable

him to take advantage of [the] exculpatory testimony") (citation omitted); Lugo v. Munoz, 682 F.2d 7, 9–10 (1st Cir.1982) (government has no Brady burden when facts are readily available to a diligent defender); United States v. Zackson, 6 F.3d 911, 918 (2d Cir.1993) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."); United States v. Perdomo, 929 F.2d 967, 973 (3d Cir.1991) (dicta) ("Evidence is not considered suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."); United States v. Todd, 920 F.2d 399, 405 (6th Cir.1990) (nondisclosure of possible exculpatory material does not violate Brady when the "defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence."); United States v. Romo, 914 F.2d 889, 899 (7th Cir.1990) (when defense counsel knows about a witness with possible exculpatory information, and has an opportunity to subpoena that witness, prosecutor has no obligation to seek out and provide the information).

Here, Petitioner's father married Charlotte Bednarchick Marinelli when Petitioner was about eleven years old, and Petitioner lived with them. (Doc. 9, petition at 27). Up until the time of her suicide in 1988, Charlotte Marinelli was psychiatrically hospitalized several times and had attempted suicide on more than