IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN MARINELLI, | : | Civil No. 4:07-cv-00173 |
| | : | |
| Petitioner, | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | THIS IS A CAPITAL CASE |
| LAUREL HARRY, et al., | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM OPINION

Before the Court is a "Joint Motion to Temporarily Lift the Stay and Partial Withdrawal of Opposition." (Doc. 97). In the joint motion, the Commonwealth "withdraws its opposition to penalty phase relief on Claim 1" of Petitioner Kevin Marinelli's Petition for a Writ of Habeas Corpus by a Prisoner in State Custody Under Sentence of Death ("Petition") (Doc. 9), in which he alleges "that [his] confrontation rights, under *Bruton* and its progeny, were violated." (Doc. 97 at 1). Because the Commonwealth has withdrawn its opposition, the parties jointly ask the Court to lift the stay presently imposed in this case, grant Petitioner relief, and remand to the state court for resentencing. (*Id.* at 1–2). The Court concludes that, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny, Petitioner is entitled to partial relief on Claim 1 of his Petition, i.e., he is entitled to relief based on the conclusion that his *Bruton* rights were violated at the penalty phase of his trial.

I.  **BACKGROUND**

On May 18, 1995, following a joint jury trial for Petitioner Kevin Marinelli and co-defendant Thomas Kirchoff in the Court of Common Pleas of Northumberland County, Pennsylvania, Petitioner was convicted of first-degree murder, robbery, conspiracy to commit robbery, burglary, theft by unlawful taking, receiving stolen property, and aggravated assault. *See Commonwealth v. Marinell*, 690 A.2d 203, 209–10 (Pa. 1997) ("*Marinelli-I*").

The evidence at trial demonstrated that on the evening of April 26, 1994, Petitioner, Kirchoff, and Petitioner's brother, Mark Marinelli, burglarized the home of Conrad Dumchock. *Marinelli*, 690 A.2d at 209. It was undisputed that Petitioner struck Dumchock at least one time after locating him inside the home, that Dumchock was severely beaten before his murder, and that it was Petitioner who eventually shot and killed Dumchock. *See Marinelli*, 690 A.2d at 209–10. Witness testimony differed, however, as to whether it had been Petitioner, Kirchoff, or both men who beat Dumchock before his murder.

The Commonwealth introduced statements made by both co-defendants at trial through the testimony of Trooper Richad Bramhall. In relaying the co-defendants' statements, Trooper Bramhall redacted all references made to one co-defendant made by the other co-defendant with the phrase "the other guy." Trooper Bramhall testified that Petitioner confessed, in relevant part, as follows:

> He said that he held the gun up, and he believed Conrad recognized it as a gun. He said that Conrad—again, he described that he looked scared. And he said that Conrad made a comment to the effect of, [y]ou can have whatever you want, or take whatever you want.

2

\*\*\*

[H]e said that after he got the gun out and held it between himself and Conrad, he said that his brother, Mark, then came from the bottom of the stairs, came up and got to the top and stood – what he described as slightly behind him and off to his left. He said, again, that his brother still had the baseball bat.

\*\*\*

At any rate, while his brother, Mark, had gotten up to the top of the stairs, and was standing somewhat behind him, he said then he saw the other guy started to come up the stairs quickly. He said the other guy had the ax handle in his hand, and he was quickly coming up the stairs. At that point, [Petitioner] said he believed, because of the way the other guy was coming up the stairs and how that was happening, he believed that the other guy was going to hit Conrad with the ax handle.

\*\*\*

He said that since he thought that the other guy was going to hit Conrad with the ax handle, that if he hit him first, that the other guy wouldn't hit him. So he said that he took the gun and hit Conrad in the face with it.

\*\*\*

He said that just after he hit Conrad in the face with the gun, he said the other guy now had gotten to the top of the stairs. And he said the other guy then hit Conrad in the legs, he said around the area of the knees with the ax handle that he had. He said once the other guy hit Conrad in the legs with the ax handle, said then Conrad fell down. And he described him falling on to his right side. He said at that point . . . Conrad made a comment about, [p]lease don't hurt me, after he got hit and fell down. And [Petitioner] said that he told the other guy something along the lines of, you know, don't hit him anymore, don't hit him again . . . . But anyway, the other guy, he said, just started hitting him with the ax handle. He said he hit him a lot of times and he hit him all over.

\*\*\*

He goes on to explain that after the first time he told the other guy to stop hitting Conrad, and he believed the other guy didn't hear him, he said that he told him again. And then he said he reached out and grabbed him, either his shoulder or somewhere in that area, he grabbed him and kind of yanked him. And he said then the guy finally stopped hitting him. And he said, at that point, he told

3

> the other guy . . . [d]on't hit him anymore. And he told the other guy, [j]ust stay and watch him.
>
> \*\*\*
>
> He said that at that point after Mark went downstairs, saying he was going to get the stereo equipment, [Petitioner] said that he then went from the area in the hallway there into the bedroom at the right [to search for items to steal].
>
> \*\*\*
>
> He said that when he came out of the bedroom into the hallway now he sees the other guy – he sees Conrad laying in the same place, but now he says he sees the other guy with the ax handle. He says that the other guy has the ax handle around the neck of Conrad Dumchock, underneath his neck, and that he has got both of his hands on the ax handle. And he describes him as having his knee on his back and him pulling up on the ax handle, like he believed he was trying to choke him. . . . He claimed, again, that he went up the guy and yelled at him and told him, [g]et off of him, you're going to kill him, something to that effect.
>
> \*\*\*
>
> [H]e described at that point that . . . there was a lot more blood. He said he thought Conrad must have been hit more times while he was in the bedroom because he said that compared to the first time he saw him, now there was more blood on the . . . door frame and around Conrad's head, and on his head, and . . . on the floor.

(Doc. 26-5, at 23–33.)

Conversely, Kirchoff told Trooper Bramhall that it was Petitioner who initially beat Dumchock, and that he only joined in mid-beating:

> [Kirchoff] said that the other guy left that area and went up the stairway. Soon afterwards [Kirchoff] described . . . a scuffle up the stairs, at the top of the stairs. He said at that point when he heard the scuffle, he said that he began going up the stairs himself. . . . He said that when he got near the top of the stairs . . . he said that he saw the other guy. And he described it as pounding on a guy with the baseball bat. And he said that [] guy, who was being pounded on, was Conrad Dumchock.
>
> \*\*\*

4

> At the point when he described getting near the top of the stairs, and he described the other guy pounding on Conrad Dumchock with the baseball bat, he paused in his account of what had happened. I asked him to go on and describe what happened next. . . . He eventually said he got to the top of the stairs. And he said, "I went into a frenzy."
>
> ***
>
> [H]e said again, [y]ou know, I lost it, I just lost it. . . . And he said, I had the baseball bat, and I started hitting him and hitting him. . . . and I kicked him a few times. And then I settled down and I stopped hitting him, and I realized that I did something very wrong.

(Doc. 26-5, at 93–101). Kirchoff's version also differed from Petitioner's in that he did not describe "any hitting of Conrad Dumchock after that [initial] frenzied episode[,]" but instead implied that Dumchock was only beaten at one point in time. (Doc. 26-5, at 100–01).

The Commonwealth also called Mark Marinelli and Nathan Reigle, a friend of Petitioner, to testify at trial. Mark testified that Petitioner and Kirchoff each participated in Dumchock's initial beating, but asserted that only Kirchoff continued to beat Dumchock as the burglary progressed:

> PROSECUTOR: When you got up the steps, what did you see?
>
> MARK: I saw [Petitioner] and [Kirchoff] hit him.
>
> PROSECUTOR: What did you see [Petitioner and Kirchoff] hit him with?
>
> MARK: Baseball bats.
>
> ***
>
> PROSECUTOR: How many times did you observe them him at that point?
>
> MARK: Ten or fifteen.

5

| | |
|---|---|
| PROSECUTOR: | What did you do? Speak up. |
| MARK: | I told them to stop. |
| PROSECUTOR: | When you told them that, what was their reaction? |
| MARK: | They stopped. |
| PROSECUTOR: | What did you do next? |
| MARK: | I went back downstairs. |

\*\*\*

| | |
|---|---|
| MARK: | When I got to the first floor I heard him being hit again, so I went up. |
| PROSECUTOR: | What kind of sounds? Did you hear any sounds coming from [Dumchock]? |
| MARK: | I could hear him moaning. |

\*\*\*

| | |
|---|---|
| PROSECUTOR: | What did you see when you got back up? |
| MARK: | When I got up to the top, [Kirchoff] was hitting him. |
| PROSECUTOR: | Where was Conrad Dumchock at this point? |
| MARK: | Still laying at the top of the steps. |
| PROSECUTOR: | Who was hitting him? |
| MARK: | [Kirchoff]. |

\*\*\*

| | |
|---|---|
| PROSECUTOR: | Now, during the time you were in here, you were downstairs and you were upstairs on these occasions, could you hear anybody questioning Conrad Dumchock? |

6

| | |
|---|---|
| MARK: | Yeah. |
| PROSECUTOR: | Who was doing the asking? |
| MARK: | Pretty sure it was [Petitioner]. |
| PROSECUTOR: | Could you hear anything else going on while the questioning was being asked? |
| MARK: | Well, I could hear him being hit in between. |
| PROSECUTOR: | If I characterized it as a question and then a hit, would that be accurate? |
| MARK: | Yes. |

(Doc. 26-3, at 137–42).

During his testimony, Reigle recounted a conversation he had with Petitioner in the days after Dumchock's murder. In Reigle's recounted version of events, however, Kirchoff is not implicated in Dumchock's beating:

| | |
|---|---|
| REIGLE: | [Petitioner] said he went to the top of the steps, sir, and was in an encounter, sir. |
| PROSECUTOR: | An encounter with whom? |
| REIGLE: | With Conrad Dumchock, sir. |
| PROSECUTOR: | Did he give you any description of this encounter? |
| REIGLE: | Yes, sir. |
| PROSECUTOR: | How did it take place? What did he say? |
| REIGLE: | He said that Conrad Dumchock said, [w]hat are you doing in my house, sir. |

7

| | |
|---|---|
| PROSECUTOR: | And what did [Petitioner] say he responded? |
| REIGLE: | Yes, sir. |
| PROSECUTOR: | What did he say? |
| REIGLE: | He said that he responded by an encounter, sir, a physical encounter. |

\*\*\*

| | |
|---|---|
| PROSECUTOR: | Well, tell us more about the encounter. What next happened? |
| REIGLE: | He said that he started getting in a scuffle, started hitting him with a baseball bat, sir. |

\*\*\*

| | |
|---|---|
| REIGLE: | He said that he hit him numerous times with the bat, sir. |

\*\*\*

| | |
|---|---|
| PROSECUTOR: | Did he describe what Conrad Dumchock was doing or saying? |
| REIGLE: | Yes, sir. |
| PROSECUTOR: | What did he say? |
| REIGLE: | He said that he was moaning, sir. |
| PROSECUTOR: | Did [Petitioner] describe any responses he had made or given to Conrad? |
| REIGLE: | He said he was moaning, sir. |
| PROSECUTOR: | He would moan? |
| REIGLE: | Yes, sir. |
| PROSECUTOR: | Did [Petitioner] describe any responses he had made or given to Conrad? |

8

| | |
|---|---|
| REIGLE: | Could you repeat the question? |
| PROSECUTOR: | While Conrad moaned, was there any response from [Petitioner]? |
| REIGLE: | Yes, sir. |
| PROSECUTOR: | What was that? |
| REIGLE: | He just kept telling him to quit looking at him, and kept hitting him with the bat, sir. |

(Doc. 26-3, at 56–59).

After convicting Petitioner during the guilt phase of trial, the jury found two aggravating circumstances at the penalty phase: (1) Petitioner committed the killing while in the perpetration of a felony; and (2) Petitioner committed the offense by means of torture. *Marinelli-I*, at 219–20; 42 PA. CONS. STAT. § 9711(d)(6), (8).

On direct appeal, Petitioner asserted that the introduction of Kirchoff's confession violated the Confrontation Clause and that the "redaction had the effect of emphasizing the incriminating statements." *Marinelli-I*, at 220. The Pennsylvania Supreme Court denied relief. Although it recognized that "where the jury can infer that the redacted confession implicates the defendant, the defendant's rights" under the Confrontation Clause are implicated, it found any error to have been harmless "in view of the overwhelming evidence against [Petitioner] . . . and the trial court's repeated instructions to the jury that the statements were to be used only against the person who made them[.]" *Id.* at 220

9

On August 10, 2007, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his convictions and death sentence. (Doc. 9). Petitioner supplemented his petition with a memorandum of law on November 13, 2007. (Doc. 18). In his petition, Petitioner asserted, among other claims, that the Pennsylvania Supreme Court erred by deeming the trial court's admission of Kirchoff's statement at the guilt phase of trial and incorporation of Kirchoff's statement into the record at the penalty phase harmless error. (Doc. 18, at 21–26).

On November 26, 2012, the Court denied Petitioner's petition but granted a certificate of appealability "with respect to [his] Confrontation Clause claim under *Bruton*." (Doc. 46, 47). Although the Court recognized that Kirchoff's statement undermined Petitioner's guilt phase defenses and supported both aggravating circumstances at the penalty phase, the Court agreed with the Pennsylvania Supreme Court that the *Bruton* error was harmless and, therefore, denied relief on the *Bruton* claim. (*See* Doc. 46, at 63–88).

On December 21, 2012, Petitioner filed a timely motion to alter judgment pursuant to Federal Rule of Civil Procedure 59(e). (Doc. 48; Doc. 49). Petitioner did not challenge the Court's denial of his *Bruton* claim in his motion, however. (*See* Doc. 49).

On May 14, 2013, before his Rule 59(e) motion was fully briefed, Petitioner filed a supplement wherein he "proffer[ed] [a] newly obtained affidavit of Nathan Reigle" who alleged (1) that the Commonwealth promised that it "would forego prosecuting him" in exchange for his testimony against Petitioner; and (2) that the Commonwealth "solicited and

10

coached [him] to give false and misleading testimony at trial." (Doc. 56). Petitioner also requested that the Court stay his federal proceeding to permit him to return to state court to "exhaust state remedies arising from the new evidence." (*Id.* at 22). The Court granted Petitioner's request. (Doc. 67). His case remained stayed thereafter until December 30, 2014, at which time the Court reopened his case and instituted a new briefing schedule. (*See* Doc. 69).

On March 4, 2016, despite certain portions of Respondents' briefing still outstanding, the parties jointly moved to stay Petitioner's federal proceedings a second time. In support, the parties indicated that they wished to grant Petitioner the opportunity to exhaust state remedies related to newly discovered evidence that a Pennsylvania Supreme Court Justice had allegedly participated in offensive "religious, racial, and sexual emails," which "creat[ed] the appearance of bias, or actual bias, compromising the integrity, fairness ,and impartiality of the state supreme court's review of the denial of PCRA relief." (*See* Doc. 93; Doc. 94). The Court granted the parties' joint motion on March 15, 2016, and stayed Petitioner's federal case a second time. (Doc. 95).

The parties filed the present "Joint Motion to Temporarily Lift the Stay and Partial Withdrawal of Opposition" on June 9, 2025. (Doc. 97). In the joint motion, the Commonwealth indicates that it has conducted a fresh review of the record and has "concluded that as it relates to the penalty phase of trial, and the torture aggravator, there was more potential for harm . . . given [P]etitioner's efforts at trial to minimize his

11

involvement in the beating of the victim." (Doc. 97, at 2). In sum, the Commonwealth now agrees with the argument Petitioner originally made in his habeas petition that the incorporation of Kirchoff's confession into the penalty phase record of his trial caused substantial and injurious harm requiring habeas relief. (*See id.*).

Given the Commonwealth's changed position, Petitioner indicates that, if the Court agrees with the parties, amends its judgment, and remands to the state court for a new sentencing hearing, he "will withdraw the above captioned petition for writ of habeas corpus" in exchange for the Commonwealth "not pursu[ing] a new capital sentencing hearing." (Doc. 97, at 2).

On July 23, 2025, the Court ordered the parties to file supplemental briefing in support of their joint motion because it "cannot simply conclude that the error was not harmless" based solely on the parties' agreement. *E.g.*, *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 144–46 (3d. Cir. 2024). Both parties have now filed supplemental briefing, and this matter is ripe for adjudication. (Doc. 104; Doc. 109).

## II.   ANALYSIS

### A. Relief is permissible under Rule 59(e).

As an initial matter, the Court must determine whether the parties' joint motion is procedurally viable. Petitioner asserts in his briefing that the Court should construe the joint motion as an amendment to his previously filed Rule 59(e) motion to alter judgment (Doc.

48). (Doc. 104, at 11–13). The Court agrees with this assessment and will analyze the parties' pending motion in the context of relief pursuant to Rule 59(e).

Although a Rule 59(e) motion must be filed within 28 days of the entry of judgment, a court may consider supplemental grounds to alter or amend a judgment contained in filings dated beyond 28 days post-judgment so long as a timely Rule 59(e) motion remains pending at the time the supplement is filed and the opposing party does not object to supplementation. *See Lizardo v. United States*, 619 F.3d 273, 277 (3d. Cir. 2010). This is because "time limits that are not based on a statute, such as the ones governing Rule 59(e), are not jurisdictional rules, but claim-processing rules[,]" and "[i]n ruling on a Rule 59(e) motion, a District Court is not limited to the grounds set forth in the motion itself." *Id; Bullock v. Buck*, 611 F. App'x 744, 746 n.2 (3d. Cir. May 1, 2015).

Petitioner filed his motion to alter judgment pursuant to Rule 59(e) within 28 days of the Court's denial of his habeas petition. (Doc. 47; Doc. 48). The Court concludes that the pending Joint Motion to Temporarily Lift the Stay and Partial Withdrawal of Opposition (Doc. 97) may be considered because it presents supplemental grounds to alter or amend judgment pursuant to *Lizardo*. *See supra*. Therefore, the Court will consider whether relief is warranted pursuant to the Rule 59(e).

### B. Relief is substantively appropriate.

Having determined that relief is procedurally permissible, the Court next turns to the substance of the parties' joint motion. Petitioner contends that the joint motion should be

granted because the Court erred by deeming the incorporation of Kirchoff's statement into evidence at the penalty phase of Petitioner's trial harmless error. He argues that, at the penalty phase, "the trial court allowed the jury to consider Kirchoff's statement against [him] to establish the torture aggravating circumstance[]" by incorporating the guilt phase record, including the *Bruton* error, into evidence. (Doc. 104, at 21). Because the statements of Petitioner, Kirchoff, Mark Marinelli, and Nathan Reigle each differed at the guilt phase, Petitioner contends that the incorporation of Kirchoff's statement into the penalty phase record was not harmless error because it "shored up the evidence presented in support of the torture aggravating circumstance." *Id.* at 17.

This is especially true, according to Petitioner, because "[t]he remaining evidence pointing to [him] was in fact limited." *Id.* Petitioner notes, for example, that Reigle's testimony omitted Kirchoff's participation in the crime entirely, which is "a proposition that is inconsistent with the evidence as well as the jury's verdicts." *Id.* at 18. He further notes that, although Mark Marinelli testified that he had participated in beating Dumchock with a baseball bat, Mark's testimony was significantly weakened by his cross-examination, during which it was revealed that he testified pursuant to a plea agreement, had a prior conviction for providing false information to law enforcement, had previously given additional inconsistent statements, admitted to having memory issues while drinking, and stated "that he was lying for the prosecution." *Id.* at 15.

In their supplemental briefing, Respondents assert that the *Bruton* error "was clearly harmless in the guilt phase" because "[e]vidence overwhelmingly demonstrated that [P]etitioner was the shooter and the shooting was intentional." (Doc. 109, at 6). As for the penalty phase, however, Respondents indicate that they now agree with Petitioner that the trial court's incorporation of the *Bruton* error into the penalty phase record was not harmless.

In their original briefing in opposition to Petitioner's *Bruton* claim, Respondents argued that "[t]he substantial evidence against [Petitioner], coupled with the trial court's repeated instructions to the jury that [Kirchoff's] statements were to be used only against [him]," defeated Petitioner's *Bruton* error claim at both the guilt and penalty phases of trial. (*See* Doc. 27, at 47). In making that argument, however, Respondents focused on the weight of the evidence presented at the guilt phase and did not separately analyze the impact of the error on the Commonwealth's ability to establish the torture aggravator at the penalty phase. *See id.*

Having now conducted a separate analysis, Respondents contend that, without Kirchoff's statement, the jury likely would not have found the torture aggravator because the remainder of the evidence did not support the conclusion that Petitioner participated in beating Dumchock over an extended period. Respondents note, for example, that although Mark Marinelli testified Petitioner was involved in Dumchock's initial beating, he asserted that Dumchock's initial beating was comprised of 10 or 15 strikes and that only Kirchoff

15

continued to beat Dumchock thereafter. (Doc. 109, at 9). Because the evidence revealed that Dumchock had been stricken 47 times in total, Respondents contend that, absent Kirchoff's statement that both and he and Petitioner participated in the entirety of Dumchock's beating, there would have been insufficient evidentiary support for the conclusion that it was Petitioner who tortured Dumchock. (*See* Doc. 109, at 9).

Respondents also contend that the Commonwealth's closing argument "magnified the *Bruton* error that was already in the case[]" by reiterating, based on Kirchoff's statement, that Petitioner was responsible for causing "at least 27 additional wounds" beyond the first 10 or 15 strikes. (Doc. 109, at 11; Doc. 26-8, at 51). Respondents conclude: "[o]nly the Kirchoff statement places blame on [P]etitioner for a prolonged and vicious beating . . . [a]s it relates to the torture aggravator . . . the error had a substantial effect on the jury's conclusion." (Doc. 109, at 12).

Based on the current procedural posture of this case and Respondents' revised assessment of the harm caused by Kirchoff's statement at the penalty phase of Petitioner's trial, the Court agrees that Petitioner is entitled to the relief requested. Third Circuit case law instructs that, where a court detects a *Bruton* error, it "must next assess whether the *Bruton* error had a 'substantial and injurious' effect or influence in determining the jury's verdict'—i.e., if it requires reversal." *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 798 (3d. Cir. 2020) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Habeas relief must be granted whenever there is a 'grave doubt' as to the harmlessness of the error.

*O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). In assessing grave doubt, the Supreme Court has cautioned "'that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict.'" *Id.* at 435. In addition, a court must consider the following "host of factors" when analyzing the presence of harmless error:

> the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Relief cannot automatically be granted where a federal court disagrees with a state court's harmless error analysis, however. Instead, where a state court has analyzed the merits of a petitioner's claim and found the presence of a constitutional error harmless, a petitioner must, on habeas review, satisfy both the *Brecht* "substantial and injurious" standard and the requirements of AEDPA to be afforded relief. *Brown v. Davenport*, 596 U.S. 118, 134–41 (2022). Once again, given the agreement of the parties in this case, and their arguments now proffered, the Court agrees that the requisite standards have been met.

The jury was presented with four versions of events during the guilt phase, each of which were later incorporated into the penalty phase record. In Petitioner's version, he only struck Dumchock one time after initially encountering him, and it was Kirchoff who beat Dumchock before his murder. (*See* Doc. 26-5, at 23–33). In Kirchoff's version, he and

17

Petitioner jointly beat Dumchock. (*See* Doc. 26-5, at 93–101). In Mark Marinelli's version, Petitioner and Kirchoff each participated in Dumchock's initial beating, but it was only Kirchoff who continued to beat Dumchock afterward. (*See* Doc. 26-3, at 137–42). Finally, in Reigle's version, it was only Petitioner who beat Dumchock. (*See* Doc. 26-3, at 56–59).

In Pennsylvania, torture is defined as "the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel manifesting exceptional depravity." *Commonwealth v. Nelson*, 104 A.3d 267, 268 (Pa. 2014) (citation omitted). Had Kirchoff's statement not been introduced at the guilt phase and then incorporated into the penalty phase record, it is not likely that the Commonwealth could have established the torture aggravator. Only two of the four versions of events, Kirchoff's version and Reigle's version, involve Petitioner beating Dumchock after the initial encounter or for a prolonged period. And of those two, Reigle's version is not supported by the evidence. Consequently, as Respondents now assert, had Kirchoff's statement not been incorporated into the penalty phase, it is unlikely that the Commonwealth could have established the torture aggravating factor on the remaining evidence. Therefore, rather than the *Bruton* error being harmless, it was a substantial and injurious error at the penalty phase. This assessment indicates that the Pennsylvania Supreme Court's determination was an unreasonable application of clearly established federal law.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny, the confrontation clause error was not harmless at the penalty phase of Petitioner's trial and, therefore, relief is appropriately granted pursuant to Rule 59(e). A separate Order will enter.

_____
Robert D. Mariani
United States District Judge